UNITED STATES of America, Plaintiff,

v.

GLENEAGLES INVESTMENT CO., INC.,
et al., Defendants.

Civ. No. 80–1424.

United States District Court,
M.D. Pennsylvania.

May 20, 1983.

Beth A. Kaswan, Tax Division, U.S. Dept. of Justice, Washington, D.C., for Dept. of Justice.

D. Alan Harris, Sp. Deputy Atty. Gen., Chicago, Ill., for Com. of Pa.

Robert C. Nowalis, Wilkes-Barre, Pa., for trustee.

Eugene J. Wien, Office of District Counsel, I.R.S., Philadelphia, Pa., for I.R.S.

Gerald J. Butler, Joseph Solfanelli, Scranton, Pa., for Gleneagles Inv.

Edward R. Slaughter, Jr., Washington, D.C., Thomas G. Bailey, Jr., New York City, for Pagnotti Enterprises.

Neil L. Conway, Wilkes-Barre, Pa., for Gillens and Clevelands.

## OPINION

MUIR, District Judge.

### I. Introduction.

This action was commenced by the United States on December 12, 1980, by the filing of a complaint and a motion for a temporary restraining order. Subsequently, four amended complaints have been filed. In the fourth amended complaint, filed May 17, 1982, the United States (1) seeks to reduce to judgment alleged delinquent federal income taxes, interest, and other penalties assessed and accrued against Defendant Raymond Colliery Co., Inc. (Raymond Colliery) and its subsidiaries for the fiscal years ended June 30, 1972 and June 30, 1973, and against Defendant Great American Coal Co., Inc. (Great American) and its subsidiaries, including Raymond Colliery, for the fiscal year ended June 30, 1975; and (2) seeks to collect these tax claims and tax claims previously reduced to judgment in *United States of America v. Raymond Colliery Co., Inc., et al.,* Civil No. 79–1168, slip op. (M.D.Pa. October 10, 1980), from surface and coal lands presently owned by Raymond Colliery as well as from lands formerly owned by Raymond Colliery but which, as a result of allegedly illegal and fraudulent county tax sales, are now owned by Defendant Gleneagles Investment Co., Inc. (Gleneagles). Jurisdiction of this Court is invoked pursuant to 26 U.S.C. §§ 1340 and 1345 as well as 26 U.S.C. §§ 7402(a) and 7403.

On October 10, 1980, this Court granted judgment in favor of the United States and against Raymond Colliery and its subsidiaries for assessed and unpaid federal income taxes for fiscal years 1966, 1967, 1968, 1969, and 1971 in the amount of $2,795,-795.16 plus interest. *United States v. Raymond Colliery Co., Inc., et al.,* Civil No.

79–1168, slip op. (M.D.Pa. October 10, 1980). On September 17, 1982, this Court granted the motion of the United States for partial summary judgment with respect to its attempt to reduce to judgment its claims against Raymond Colliery for the tax years ended June 30, 1972 and June 30, 1973. Judgment was entered in favor of the United States and against Raymond Colliery and its subsidiaries in the amount of $119,704.08 for unpaid interest for the fiscal year ended June 30, 1972 and in the amount of $16,800.00 for unpaid taxes and $9,462.19 for unpaid interest for the fiscal year ended June 30, 1973. *United States v. Tabor Court Realty Corp.*, et al., Civil No. 80–1424, slip op. (M.D.Pa. September 17, 1982). Thus, the United States presently has judgments against Raymond Colliery and its subsidiaries for all of the involved tax liabilities except those alleged to be due for the fiscal year ended June 30, 1975.

The United States contends that as a result of its judgments and other claimed taxes it has substantial liens against properties now held or once held by Raymond Colliery and its subsidiaries. In addition to the liens held by the United States, many other persons hold liens against these properties. One purpose of the United States in instituting this lawsuit is to assert the priority of its liens over liens held by other persons. Those lienors named as additional Defendants in this lawsuit are General Electric Credit Corporation, the Commonwealth of Pennsylvania, the Borough of Olyphant, John J. Gillen, Thomas J. Gillen, Robert W. Cleveland & Sons, Inc., William T. Kirchoff, J.W. Cleveland, the Estate of Royal E. Cleveland, the City of Scranton Sewer Authority, the Lackawanna River Basin Authority, the Borough of Taylor, Lackawanna County, William R. Hinkelman, and McClellan Realty Co., Inc. (McClellan). Also named as Defendants are Jeddo Highland Coal Co., Pagnotti Enterprises, Inc., Loree Associates, Blue Coal Company, Gillen Coal Mining Co., Carbondale Coal Co., Moffat Premium Anthracite, Northwest Mining, Inc., Maple City Coal Co., Powderly Corporation, Clinton Fuel Sales, Inc., Olyphant Premium Anthracite, Inc., Olyphant Associates, Minindu Corporation, Glen Nan, Inc., Gilco, Inc. and Joseph Solfanelli, individually and as trustee. Blue Coal and Glen Nan went into bankruptcy in December of 1976 and the interests of those companies are asserted herein by James Haggerty, the trustee in bankruptcy (the Trustee). *See In re Blue Coal Corp.* —Bankrupt, BK 76–1311 (M.D.Pa., petition filed Dec. 16, 1976); *In re Glen Nan, Inc.* —Bankrupt, BK 78–604 (M.D.Pa., petition filed Dec. 16, 1976).

In order to collect its judgments for delinquent tax liability, the United States seeks in this lawsuit to foreclose its tax liens against and to sell the property owned by Raymond Colliery and its subsidiaries (hereinafter sometimes called the "Raymond Group") at the time the tax assessments were made. This property falls into two categories, lands presently owned by the Raymond Group and lands formerly owned by the Raymond Group. According to the complaint, as to the second category, because of the failure of Raymond Colliery and Blue Coal to pay certain delinquent real estate taxes, Lackawanna County and Luzerne County scheduled tax sales for December 17, 1976 of certain Raymond Colliery and Blue Coal real properties. Substantially all of the Raymond Colliery properties advertised for sale were purchased by Defendant Tabor Court Realty Corp. (Tabor Court) for the upset bid of $385,000.00. The United States contends that the Lackawanna County Tax Claim Bureau failed to give adequate notice of the 1976 tax sale to the Internal Revenue Service. Accordingly, the United States claims, pursuant to 26 U.S.C. § 7425, that even if the 1976 tax sale was a bona fide tax sale it would have no effect on the federal tax liens filed prior to the date of the sale. Because thereafter Tabor Court did not pay certain real estate taxes on the Raymond Colliery properties, Lackawanna County scheduled a second tax sale of the Raymond Colliery properties for December 16, 1980. At the December 16, 1980 tax sale, Joseph Solfanelli, a Defendant in this action, purchased the properties for $612,239.56. In January of 1981, Glen-

eagles was incorporated in Pennsylvania with Joseph Solfanelli as its sole shareholder. The properties were subsequently transferred directly to Gleneagles by the Lackawanna County Commissioners by deed of April 15, 1981. The United States challenges both the December 17, 1976 and December 16, 1980 tax sales in this lawsuit.

In addition, the United States seeks to set aside as fraudulent conveyances under Pennsylvania's Uniform Fraudulent Conveyances Act, 39 Pa.Cons.Stat. § 351 *et seq.*, certain mortgages purporting to encumber the lands of Raymond Colliery and its subsidiaries. These mortgages were delivered on November 26, 1973 to Institutional Investors Trust (IIT) to secure certain loans made by IIT allegedly to finance the purchase of the stock of Raymond Colliery by Great American, the newly formed parent of Raymond Colliery. The mortgages were assigned to McClellan on January 26, 1977. The United States asserts that the mortgages are void in the hands of McClellan because McClellan had knowledge that the mortgages were fraudulent conveyances.

In addition to the claims of the United States, certain Defendants in this lawsuit, the Commonwealth of Pennsylvania, and the Trustee in Bankruptcy of Blue Coal and Glen Nan have substantial claims against the other Defendants. Indeed, while the Commonwealth and the Trustee are nominal defendants, their interests are largely aligned with those of the United States and this case has been tried so far almost as if the Commonwealth and the Trustee in Bankruptcy were co-plaintiffs. The Commonwealth claims to have liens in the amount of $1.8 million against the properties now held or once held by Raymond Colliery and its subsidiaries. Like the United States, the Commonwealth seeks a judgment declaring void the IIT mortgages so that the Commonwealth may also foreclose on its liens and sell the properties free and clear of the mortgages. The Trustee also seeks to have the IIT mortgages set aside and has filed a crossclaim against some of the other Defendants in this lawsuit. The Trustee, of course, under the Bankruptcy Act can assert the rights and powers of any actual creditor of the bankrupt corporations in challenging any transfer or obligation incurred by those companies. 11 U.S.C. § 110(e) (1970). The Trustee desires to liquidate Blue Coal and Glen Nan assets free and clear of the IIT mortgages for the benefit of the creditors of those corporations.

This case was placed on the Court's November 1982 trial list to be tried without a jury on the liability issues which were claimed to be interrelated. Trial commenced on November 3, 1982. By order of December 30, 1982, when no evidence had been presented on the second liability issue, the undersigned directed that only the first issue of liability, denominated as the validity of the 1973 mortgages, be tried at that time. Trial on the first issue of liability concluded on March 17, 1983 for a total of 68 trial days. The Court is now trying the second liability issue. Subsumed in the first issue are the questions of whether the IIT mortgages were fraudulent conveyances and whether the IIT mortgages were otherwise void because they were executed for illegal and ultra vires purposes. Also included within the first issue is whether the selling shareholders are liable for breaching any duty to creditors of the Raymond Group of corporations or to the corporations themselves by participating in a transaction whereby the corporations immediately used the IIT loan proceeds to finance the purchase of the Raymond Colliery stock and whether the payment of the loan proceeds to the selling shareholders was a fraudulent conveyance. All other issues in this case are to be tried subsequent to the Court's decisions on the first and second issues.

Following are the Court's findings of fact, discussion, and conclusions of law with regard to the first issue of liability. Issuance of this decision was delayed approximately one month because additional briefing was required on questions relating to the liability of the selling shareholders of the Raymond Colliery stock.

## II. Findings of Fact.

1. Raymond Colliery was incorporated in approximately 1962 as a Pennsylvania corporation.

2. Raymond Colliery owned the stock of other corporations engaged in coal mining and sales. Raymond Colliery also owned land and tangible assets in Lackawanna County, Pennsylvania.

3. The stock of Raymond Colliery was owned or controlled between 1962 and 1973 by the following persons, all of whom are Defendants: Thomas J. Gillen, John J. Gillen, Robert W. Cleveland, Robert W. Cleveland, Jr., Jay W. Cleveland, Royal Cleveland, and William T. Kirchoff (hereinafter "the Gillens and Clevelands").

4. Sometime prior to 1973, Robert W. Cleveland and Robert W. Cleveland, Jr. transferred their stock in Raymond Colliery to Defendant Robert W. Cleveland & Sons, Inc.

5. Royal E. Cleveland died after this action was instituted and Jay W. Cleveland, the administrator of the Estate of Royal E. Cleveland, has been substituted in his stead.

6. Prior to 1962, Thomas J. Gillen and John J. Gillen had been in the business of coal mining, doing business primarily under the name of Gillen Coal Co. or its successors.

7. In addition to their involvement with Raymond Colliery, Jay W. Cleveland, Robert W. Cleveland, Robert W. Cleveland, Jr. and Royal Cleveland were in the business of earth-moving equipment sales and land development, doing business as Cleveland Brothers Equipment, Inc.

8. Raymond Colliery acquired most of its lands and other tangible assets from the Glen Alden Corporation (Glen Alden). (Undisputed, hereinafter "U")

9. Glen Alden was a corporation engaged in coal production located in the Wilkes-Barre-Scranton area of Pennsylvania.

10. Glen Alden owned Blue Coal Corporation (Blue Coal), a company engaged in coal production.

11. The bulk of Blue Coal's land and other assets was located in Luzerne County. (U)

12. In 1966, Glen Alden sold all the stock and assets of Blue Coal to Raymond Colliery for $6,000,000. Raymond Colliery paid Glen Alden $500,000 in cash with the balance of the purchase price to be paid pursuant to a note secured by a mortgage on Blue Coal's lands.

13. In 1966 Raymond Colliery had the following wholly-owned subsidiaries: Blue Coal, Gillen Coal Mining, Inc. (Gillen Coal), Carbondale Coal Co., Inc. (Carbondale), Moffat Premium Anthracite, Inc. (Moffat), Olyphant Premium Anthracite, Inc. (Olyphant Premium) and Gilco, Inc. (Gilco). In addition, Raymond Colliery controlled Minindu Corporation (Minindu) and Glen Nan, Inc. (Glen Nan), which were wholly-owned subsidiaries of Blue Coal, Maple City Coal Co., Inc. (Maple City), Northwest Mining, Inc. (Northwest), Powderly Machine Corp. (Powderly Machine), and Clinton Fuel Sales, Inc. (Clinton), which were wholly-owned subsidiaries of Carbondale, and Powderly Corporation (Powderly) which was owned by Blue Coal and Carbondale.

14. Sometime prior to November 26, 1973, the Gillens and Clevelands incorporated Olyphant Associates, Inc. (Olyphant) and became Olyphant's sole shareholders. The "Raymond Group" includes Olyphant as well as those corporations described in the last preceding Finding of Fact.

15. During the period between 1966 and November 26, 1973, Thomas J. Gillen, Jr. and John J. Gillen were the managing officers of the Raymond Group of companies and were members of the Board of Directors of Raymond Colliery.

16. During the period between 1966 and November 26, 1973, Robert W. Cleveland and Royal Cleveland were members of the Board of Directors of Raymond Colliery.

17. During the period between 1966 and November 26, 1973, the Raymond Group was engaged primarily in the business of coal production and the sale of its surplus lands.

18. During the period between 1966 and November 26, 1973, the Raymond Group owned over 30,000 acres of land located in Luzerne and Lackawanna Counties.

19. Between 1966 and 1973, Blue Coal was either the largest or one of the largest anthracite coal producing companies in the United States.

20. In 1967, the Department of Environmental Resources of the Commonwealth of Pennsylvania (DER) issued an order directing Blue Coal to reduce the pollutants being pumped into public waterways from its deep mine operations or to close such operations.

21. As a result of the DER order, Blue Coal began to phase out its deep mining operations and intensify its conversion to strip mining operations.

22. "Strip mining" is above-ground mining of coal whereby the ground and rock above the coal is stripped off and the coal is removed.

23. Blue Coal incurred substantial expenses in converting to strip mining because of the cost of new and different equipment required by that process. These expenses depleted the cash reserves of the Raymond Group.

24. In 1971, the Gillens and Clevelands obtained a loan from the Chemical Bank of approximately $5,000,000 (hereinafter the "Chemical Bank mortgage").

25. The Chemical Bank mortgage was secured by Blue Coal's lands and bore interest at the rate of two points over prime. The mortgage provided that the Chemical Bank receive one-third of the net proceeds from the sales of Blue Coal's surplus lands. The net proceeds were defined as the balance remaining after deduction from the sales price of the costs of sale and expenses required to make the land marketable.

26. The Chemical Bank loan was guaranteed by Royal Cleveland.

27. The proceeds of the Chemical Bank loan were used to pay off the note given Glen Alden in 1966 by Blue Coal and secured by a mortgage on Blue Coal's lands.

28. During 1973, Blue Coal was technically in default under the working capital provisions of the Chemical Bank mortgage agreement.

29. In 1971, 1972, and 1973, the Raymond Group had serious and chronic cash flow problems because of the very substantial expenditures required for Blue Coal's conversion to strip mining.

30. In 1971, 1972, and 1973, the Raymond Group's cash flow problems were compounded by the fact that its expenses were primarily incurred during the warm season when coal production was greatest and its income was received primarily during the winter season after dealers sold coal and then became obliged to pay for coal purchases made earlier in the year.

31. In 1971, 1972 and 1973, the Raymond Group frequently discounted its accounts receivables to alleviate its cash flow problems.

32. Between 1969 and 1973, the Raymond Group was frequently, if not always, seriously delinquent in the payment of real estate taxes.

33. Taxes were often not paid until after the lands were listed for tax sale.

34. During the five-year period ending November 26, 1973, the trade accounts payable of the Raymond Group were chronically delinquent.

35. In 1973, Raymond Colliery and Blue Coal together employed between 2,000 and 3,000 employees.

36. During the five-year period ending November 26, 1973, the coal production business of the Raymond Group operated at a loss.

37. During the five-year period ending November 26, 1973, the Raymond Group was largely supported by the sales of its surplus lands.

38. The Raymond Group's consolidated statement of income for the year ended June 30, 1971 showed a net loss of $156,533.61.

39. The Raymond Group's consolidated statement of income for the year ended

June 30, 1972 showed a net loss of $239,-540.45.

40. The Raymond Group's consolidated statement of income for the year ended June 30, 1973 showed a net loss of $2,146,-514.96.

41. The unprofitability of the Raymond Group's coal production business led to disagreements between the Gillens and the Clevelands as to the advisability of continuing the coal production business.

42. These disagreements led to the decision during 1972 by the Gillens and Clevelands to sell their Raymond Colliery stock.

43. Thomas J. Gillen, Jr. was charged with finding a buyer for the stock.

44. On February 2, 1972, Royal Cleveland on behalf of the Gillens and Clevelands executed an option for the sale of the stock of Raymond Colliery to James Durkin, Sr. or his nominee for $8,500,000.

45. The Gillens and Clevelands executed at least two extensions of the option agreement with Durkin. Twice the option agreements expired because Durkin was unable to purchase the Raymond Colliery stock.

46. The final option agreement was executed on August 3, 1973 between James Durkin, Sr. and the Gillens and Clevelands.

47. The August 3, 1973 option agreement provided for the sale of Raymond Colliery's stock for $7,200,000. The reduction in price was the result of further negotiations between the parties after Durkin learned of the Raymond Group's substantial liabilities to the Internal Revenue Service.

48. The partner of James Durkin, Sr. in the purchase of the Raymond Colliery stock was James Riddle Hoffa, Sr.

49. Hoffa acted through his counsel, Eugene Zafft.

50. Sometime prior to June 30, 1973, Durkin incorporated Great American Coal Co. (Great American) and assigned to it his option to purchase the Raymond Colliery stock.

51. Great American was incorporated as a holding company.

52. The major asset of Great American at the time of its incorporation was the option to purchase Raymond Colliery's stock.

53. Fifty percent of Great American's stock was originally owned by Durkin and his wife, Anna Jean Durkin, and 50% was owned by Eugene Zafft as Hoffa's nominee.

54. Durkin and Hoffa, with the aid of Durkin's accountant and financial advisor, Charles Parente, and Durkin's counsel, Rosenn, Jenkins and Greenwald, sought financing during 1972 and 1973 for the proposed purchase of Raymond Colliery's stock. Durkin approached a series of lenders.

55. During 1972 and 1973, Rosenn, Jenkins and Greenwald participated in the Raymond Colliery stock purchase transaction in the joint capacity as counsel for Durkin and as the local agent for Chicago Title Insurance Co., the proposed title insurance carrier.

56. All of Durkin's larger loan requests were predicated on using the assets of the Raymond Group as collateral for the loans requested and repayment of the loans and interest thereon from the income and assets of the Raymond Group.

57. In March, 1972, Durkin and Hoffa sought a $13,000,000 loan from the Central States Pension Fund and the Mellon Bank to finance the stock purchase.

58. Rosenn, Jenkins and Greenwald, in their joint capacity as counsel for Durkin and local agent for Chicago Title Insurance Co., had extensive communications with Richard Pollay, Vice President and Divisional Associate General Counsel for Chicago Title Insurance Co., and individuals at the Mellon Bank and the Central States Pension Fund as to the legality of using Raymond Group assets as security for a loan the proceeds of which would be used to finance at least in part the purchase of Raymond Colliery's stock.

59. Central States Pension Fund made a commitment to finance the purchase of Raymond Colliery's stock. This loan commitment was terminated in part because Durkin failed to pay the required commit-

ment fee and in part because Mellon Bank which was to participate in the loan determined that Blue Coal was financially weak.

60. A loan request made by Durkin to the Chemical Bank for $10,000,000 was denied after officials at the Bank determined that the Raymond Group would be unable to repay the loan in a reasonable time.

61. In July, 1973, Durkin proposed to the Gillens and Clevelands that they accept for the sale of the stock $4,000,000 in cash plus a $4,500,000 note secured by Raymond Colliery and Blue Coal assets.

62. The proposal described in the preceding paragraph was rejected by the Gillens and Clevelands upon the advice of their counsel, Bernard Brown.

63. Brown advised against the proposal because he was of the view that the transfer to the Gillens and Clevelands of a mortgage of the assets of Raymond Colliery and Blue Coal as security for the purchase price of the stock would be susceptible to a challenge·by creditors as a fraudulent conveyance.

· 64. Besides serving as counsel to the Gillens and Clevelands during 1973, Bernard Brown was also Chairman of the Board of Raymond Colliery.

65. As a result of Durkin's difficulties in obtaining financing, Hyman Green, a wealthy entrepreneur, was brought into the transaction by Hoffa in the summer of 1973. Hoffa sought Green's participation because he was of the view that Green would be more adept than Durkin at obtaining financing.

66. Green became a 10% shareholder in Great American. The remaining shares of Great American were held 50% by Zafft and 40% by Durkin.

67. During the summer of 1973, the services of Benjamin Levinson, a loan broker, were sought by Green. Levinson put Green and Durkin in touch with Institutional Investors Trust (IIT).

68. IIT is a real estate investment trust with headquarters in New York City.

69. IIT is an independent lender and was unrelated to any party to the August 3, 1973 option agreement between Durkin and the Gillens and Clevelands.

70. Durkin sought $7,000,000 to $8,530,-000 from IIT to finance the purchase of Raymond Colliery's stock by Great American.

71. Durkin, Zafft, and Green concealed from IIT Hoffa's ownership interest in Great American.

72. On July 24, 1973, Great American received a loan commitment from IIT for a loan in the amount of $8,530,000.

73. Under the IIT loan commitment as revised in the fall of 1973, separate loans were agreed to be made by IIT to Raymond Colliery, Blue Coal, Glen Nan and Olyphant (hereinafter sometimes collectively referred to as the "borrowing companies") in an aggregate amount of $8,530,000. These loans were to be secured by encumbrances on assets of the borrowing companies.

74. The borrowing companies as well as Gillen Coal, Moffat, Northwest, Minindu, Gilco, Maple City, Powderly, Olyphant Premium, Clinton and Carbondale (hereinafter the "guarantors") each agreed to execute mortgages guaranteeing payment of the $8,530,000 loan secured by encumbrances on the assets of the guarantors (hereinafter the "guarantee mortgages").

75. IIT set up an interest reserve of $1,530,000 to relieve the debtors of initial interest payments.

76. James Hillary, IIT's chief in-house counsel, discussed with Walter M. Strine, Jr., counsel to IIT and a member of the firm Morgan, Lewis and Bockius, Messrs. Gellis and Taub, IIT Trustees, and John Streiker, the IIT loan administrator, the possibility that the proposed loan was structured in a manner that might hinder the collection efforts of the Raymond Group's present and future unsecured creditors.

77. Rosenn, Jenkins and Greenwald discussed with counsel for IIT the substance of the conversations described in Finding of Fact No. 58.

78. By letter of September 26, 1973, Walter M. Strine, Jr., advised James Hillary that creditors might challenge IIT's security interest in the property of the borrowing companies because the bulk of the IIT loan proceeds was to be used to pay the selling shareholders for their stock. Mr. Strine further advised IIT that the guarantee mortgages were vulnerable to a challenge by creditors of the guarantors.

79. On October 13, 1973, using assumptions far more optimistic than those which reasonably could be drawn from Blue Coal's financial statement for the year ending June 30, 1973, John Streiker forecast that, with the imposition of the proposed IIT liability, Blue Coal would have cash deficits of $704,000 by 1976 and of $904,000 by 1977.

80. In addition to the loan promised by IIT, Durkin obtained approximately $3,452,-250 in additional loans to be used for the purchase of Raymond Colliery's stock. These loans were made by lenders either to James Durkin, Sr. and Anna Jean Durkin, who then lent the funds to Great American, or directly to Great American.

81. The following funds used to acquire Raymond Colliery's stock were obtained from loans reflected on Great American's books as payable to James J. and Anna Jean Durkin:

| | |
|---|---|
| Edward & James Durkin, Jr. | $400,000 |
| First Valley Bank | 85,000 |
| United Penn Bank | 100,000 |
| Wyoming National Bank | 955,000 |
| Eugene Zafft | 188,000 |
| No. 1 Contracting Co. | 200,000 |
| Mr. Tedesco and/or individuals | 150,000 |
| J.J. Durkin, Sr. | 165,020 |
| Thrift Credit | 394,230 |

82. The following funds were obtained from loans reflected on Great American's books as payable directly to the lenders:

| | |
|---|---|
| William B. Evans | 300,000 |
| Old Forge Bank | 205,000 |
| Wyoming National Bank | 105,000 |
| Hyman Green | 205,000 |

83. The closing of the IIT loan was first scheduled for October 31, 1973. The scheduled closing was preceded by a week of loan negotiation sessions between representatives of Great American, IIT and the Gillens and Clevelands.

84. The representatives of Great American during the loan negotiation sessions were Durkin, his counsel, Rosenn, Jenkins and Greenwald, attorney Eugene Zafft, counsel for Hoffa, and James Millard, counsel for Green.

85. IIT was represented during the loan negotiation sessions by attorneys Walter Strine and Christian Day of Morgan, Lewis and Bockius and attorney Bernard Jacob of Fried, Frank, Harris, Shriver and Jacobsen.

86. The Gillens and Clevelands were represented by Bernard J. Brown, Esq. and Royal Cleveland at the loan negotiation sessions.

87. During the loan negotiation sessions preceding the closing scheduled for October 31, 1973, the representatives of IIT, Great American and the Gillens and Clevelands were all aware of the legal problems encountered when encumbering a corporation's assets to finance the purchase of its own stock. In particular, the representatives of Great American, IIT and the Gillens and Clevelands were concerned with the possibility of Raymond Group creditors challenging the proposed IIT loan under the Bankruptcy Act and the Pennsylvania Uniform Fraudulent Conveyances Act.

88. At the loan negotiation sessions preceding the closing scheduled for October 31, 1973, Walter M. Strine, Jr., Christian Day and Bernard Jacob spent approximately 50 hours discussing among themselves and with members of the firm of Rosenn, Jenkins and Greenwald the impact of the Pennsylvania Uniform Fraudulent Conveyances Act upon the loan.

89. The closing scheduled for October 31, 1973 (hereinafter "aborted closing") was aborted by Walter M. Strine, Jr., counsel for IIT, after consultation with his client, for the following reasons:

(a) Strine suspected that unknown individuals were involved with Great American and that there were undisclosed ad-

ditional sources of financing for the stock purchase.

(b) The Gillens and Clevelands produced shortly before the aborted closing financial statements for fiscal year ending June 30, 1973, which revealed additional liabilities of the Raymond Group of which IIT had previously not been aware and which created considerable uncertainty about the financial condition of the Raymond Group and its ability to meet its cash needs over the next three to five years.

90. In anticipation of the closing scheduled for October 31, 1973, mortgages and other security instruments in the amount of $8,530,000 were executed in favor of IIT by James Durkin as president of Raymond Colliery and recorded in numerous offices of Recorders of Deeds. The Gillens and Clevelands were aware that these mortgages and security instruments had been recorded and demanded their removal from the records in the several offices of Recorders of Deeds after the aborted closing.

91. After the aborted closing, and in response to IIT's concern that an undisclosed principal was involved in Great American, the stock of Great American was agreed to be issued solely in the names of Green and Durkin.

92. In order to protect Hoffa and to secure his contributions towards the purchase, Durkin and Green executed to Zafft as agent for Hoffa an option to purchase 50% of the shares of Great American.

93. Hoffa's involvement was never known to IIT; however, rumors that he was involved with Great American circulated at the offices of IIT.

94. Hoffa was known to be involved by Messrs. Greenwald and Savitz of Rosenn, Jenkins and Greenwald, Charles Parente, Bernard Brown and Royal Cleveland.

95. After the aborted closing, further negotiations took place between IIT and the borrowers, including those at two meetings at the offices of IIT on November 9, 1973 and November 15, 1973.

96. At the November 9, 1973 meeting, Charles Parente, financial advisor to Durkin presented a business plan to IIT and to George Judy, a coal expert engaged by IIT, outlining proposed improvements by the Raymond Group in coal production and real estate sales which would result in increased income to the companies.

97. The business plan drafted by Charles Parente, when adjusted for mathematical errors and changes subsequently made to the IIT loan terms, predicted that the Raymond Group would have substantial cash deficits within 2 years of the making of the IIT loan.

98. James Hillary, Vice President and General Counsel of IIT, suggested that the buyers obtain the consent of all actual and incipient creditors of the Raymond Group as a protection for IIT.

99. Hillary's suggestion was not followed in whole or in part.

100. The land release provisions of the proposed Note Purchase and Loan Agreement to be executed by the Raymond Group in conjunction with the IIT loan were re-negotiated so as to provide IIT with a greater share of the land sale proceeds.

101. Hyman Green agreed to guarantee repayment of the first $1,000,000 of the loan's principal.

102. The closing of the IIT loan was then re-scheduled for November 26, 1973.

103. Between the aborted closing and November 26, 1973, no significant changes were made to the structure of the transaction.

104. IIT agreed to make the following loans to the companies:

| | Direct Loan Proceeds | Total Loan, incl. Interest Reserve |
|---|---|---|
| Raymond Colliery | $2,590,000 | $3,156,100 |
| Blue Coal | 4,270,000 | 5,203,300 |
| Olyphant | 70,000 | 85,300 |
| Glen Nan | 70,000 | 85,300 |
| Total | 7,000,000 | 8,530,000 |

105. The loans were repayable by December 31, 1976 at an interest rate of five points over prime, but at no less than 12.5%.

106. On November 26, 1973, a Note Purchase and Loan Agreement (the Agreement) was executed by the borrowing companies and IIT.

107. The Agreement provided that each borrowing company create in favor of IIT a first lien on all its tangible and intangible assets in the amount of the loan to each borrowing company.

108. The Agreement further provided that each borrowing company guarantee the entire $8,530,000 loan and create in favor of IIT a second lien on all of its tangible and intangible assets as security for the guarantee.

109. The Agreement further provided that each of the affiliated companies, Gillen Coal, Moffat, Northwest, Minindu, Gilco, Maple City, Powderly, Olyphant Premium, Clinton and Carbondale guarantee the entire $8,530,000 loan and create in favor of IIT a first lien on all its tangible and intangible assets as security for the guarantees. The above companies also agreed to become bound by all provisions and covenants in the Agreement.

110. The IIT loans were also guaranteed by James Durkin, Hyman Green and the Barbara Coal Company, a corporation owned by Durkin.

111. The Raymond Group covenanted under the Agreement that its current assets (defined as the current assets of the Raymond Group as a whole) would never be less than "75% of the sum of (a) Current Liabilities and (b) one year's aggregate rentals under leases" of real and personal property used in the operations of the Raymond Group companies.

112. The consolidated financial statement of the Raymond Group for the six month period ending December 31, 1973, showed current assets of $3,189,096.21 and current liabilities of $4,739,612.22.

113. Based on the December 31, 1973 consolidated financial statement of the Raymond Group, the Raymond Group was technically in default of the foregoing provision of the Agreement from its inception.

114. On or about November 26, 1973, many corporations which were members of the Raymond Group were also technically in default under the working capital and ratio of debt to equity covenants of the Agreement.

115. Under the Agreement, violations of these covenants permitted IIT to accelerate the full amount of the loan as to any borrowing company and immediately collect the aggregate sum from any or all of the borrowing companies and guarantors.

116. The Agreement contained a complex formula for the years 1974 and 1975 under which IIT would release its liens on surplus lands only if portions of the first $2,500,000 of sales proceeds were paid over to IIT, Thrift Credit and the Ford Motor Credit Co. in satisfaction of certain obligations owed to each by the borrowers.

117. The operation of the release provisions for 1974 and 1975 would result in a maximum of $667,500 out of $2,500,000 in land sales proceeds available for use by the Raymond Group.

118. After payment of income and real estate taxes, if the land sales were taxed by the federal government as ordinary income, the Raymond Group would have a cash loss from the sale of its surplus lands.

119. The Agreement did not provide release provisions for the sale of non-surplus land and equipment owned by the Raymond Group and subject to the IIT lien. Because IIT could refuse to release its liens, IIT had leverage to determine which unsecured creditors of the Raymond Group would be paid out of the proceeds of the sale of non-surplus land and equipment.

120. All of the mortgages required by the Agreement of the borrowing companies and the affiliated companies were executed by James Durkin as president and recorded in the appropriate offices of Recorders of Deeds.

121. All of the financing statements relating to encumbered personalty required by the Agreement of the borrowing companies and the affiliated companies were executed by James Durkin as president and

filed in the appropriate offices of Prothonotaries.

122. In accordance with the requirements of the Agreement, Rosenn, Jenkins and Greenwald, counsel for Durkin, issued an opinion letter dated November 26, 1973 to IIT stating that the Agreement, the notes, the mortgages, and the security agreements given to secure the notes were "valid and binding in accordance with their terms."

123. The Agreement also required an opinion letter satisfactory to IIT, from Morgan, Lewis and Bockius, counsel for IIT.

124. IIT did not waive its right to an opinion letter from Morgan, Lewis and Bockius.

125. Walter M. Strine, Jr., the Morgan, Lewis and Bockius partner representing IIT, declined to provide an opinion letter despite at least one oral and six written requests by IIT to do so.

126. Strine declined to issue an opinion letter because of his concern as to the validity of the mortgages.

127. The $7,000,000 in direct proceeds lent by IIT to the borrowing companies was immediately placed in an escrow account established on November 26, 1973 at the United Penn Bank, Wilkes-Barre, Pennsylvania, for the purpose of effecting the closing disbursements.

128. The borrowing companies simultaneously with receipt of the IIT proceeds lent Great American the following amounts:

| | |
|---|---|
| Blue Coal | $1,370,000 |
| Raymond Colliery | 2,575,000 |
| Olyphant | 70,000 |
| Glen Nan | 70,000 |
| Total | $4,085,000 |

129. Great American issued to each borrowing company an unsecured note promising to repay the loans to the borrowing companies on the same terms and at the same interest rate as pertained to the loans to the borrowing companies from IIT.

130. The loans to Great American by the borrowing companies were applied toward the purchase price of Raymond Colliery's stock.

131. Great American placed approximately $2,974,501 of its borrowings from others into the escrow account.

132. The escrow account money was paid out as follows:

| | | | |
|---|---|---|---|
| a. | Gillens and Clevelands | | $6,200,000 |
| b. | Gillens and Clevelands | | 500,000 |
| c. | Bernard Brown for: | | |
| | (1) Thomas J. Gillen | 190,666 | |
| | (2) John Gillen | 218,741 | |
| | (3) Prior Minor Shareholders | 103,333 | |
| | (4) Misc. fees | 35,750 | 548,490 |
| d. | Rosenn, Jenkins and Greenwald | | 60,000 |
| e. | Parente, Randolph & Co. | | 20,000 |
| f. | Breaker down payment | | 50,000 |
| g. | Judy (coal consultant) | | 800 |
| h. | Taxes | | 34,337 |
| i. | Morgan, Lewis and Bockius | | 38,632 |
| j. | Fried, Frank, Harris, Shriver and Jacobsen | | 5,375 |
| k. | Chemical Bank | | 2,186,427 |
| l. | Glen Alden Co. | | 315,400 |
| m. | James Millard | | 15,000 |
| | Total | | $9,974,501 |

133. Great American expended the following additional sums in connection with the stock purchase transaction:

| | |
|---|---|
| Gillens and Clevelands (for the option) | $500,000 |
| Levinson (broker) | 105,000 |
| Title insurance | 37,000 |
| Recording costs | 2,500 |
| IIT commitment | 150,600 |
| IIT fee | 20,000 |
| Jackson Associates (Appraisal) | 10,000 |
| Total | $825,100 |

134. The disbursements described in Findings of Fact 132(a) and (b) covered the purchase price paid the Gillens and Clevelands for their Raymond Colliery stock.

135. The purchase price was paid in two separate checks, one for $6,200,000 and the other for $500,000. The latter check was endorsed over to Great American by Royal Cleveland on behalf of the selling shareholders as a loan from the Gillens and Clevelands to Raymond Colliery. This loan was evidenced by notes given to the Gillens and Clevelands in the aggregate sum of $500,000 by Raymond Colliery. The $500,-000 loan was the result of last minute nego-

tiations at the November 26, 1973 closing which occurred after Durkin realized the closing expenses would leave the Raymond Group with vastly depleted working capital.

136. The monies described in Findings of Fact 132(c)(1)–(4) were paid to Bernard Brown to satisfy purported debts owed by the Raymond Group to its prior shareholders.

137. The expenditures described in Findings of Fact 132(d), (e), (g), (i), (j), and (m) were for professional fees incurred by IIT, Green or Durkin in the process of completing the transaction.

138. The expenditure described in Finding of Fact 132(f) was a down payment on a coal breaker which would allegedly permit Blue Coal to produce coal more efficiently.

139. The expenditure described in Finding of Fact 132(h) was payment of delinquent real estate taxes owed on the lands of the Raymond Group.

140. The expenditure described in Finding of Fact 132(k) was in satisfaction of the Chemical Bank mortgage owed by Blue Coal and secured by a first lien on its lands.

141. The Gillens and Clevelands required satisfaction of the Chemical Bank mortgage as a condition of the sale of their Raymond Colliery stock at least in part because Royal Cleveland had personally guaranteed repayment of that loan.

142. The expenditure described in Finding of Fact 132(1) was to redeem a pledge in favor of Glen Alden of Raymond Colliery stock made in 1966 when Raymond Colliery purchased Blue Coal from Glen Alden.

143. Great American covenanted under the Agreement to remain a holding company until the IIT loan was repaid.

144. Great American's sole source of income after November 26, 1973 was dividends which might be declared by Raymond Colliery.

145. The covenants in the Agreement executed by all corporations in the Raymond Group on November 26, 1973 prevented the Raymond Group companies from making "restricted payments" prior to re-payment of the IIT loan. "Restricted payments" were defined in the Agreement as "any declaration or payment of any dividend or the making of any distribution, whether in cash, securities, or other property," on any shares of the capital stock of the borrowing companies or by the guarantor companies.

146. As a result of the above covenants prohibiting dividends, Great American had no source of income until the IIT loan was repaid.

147. Great American, IIT and the Gillens and Clevelands knew Great American had no source of income and would be unable to pay, in accordance with their terms, the notes given the borrowing companies in exchange for the loan to Great American of the IIT loan proceeds.

148. Great American and IIT knew Great American would be unable to pay the $3,452,000 in loans it obtained from lenders other than IIT in order to finance the stock purchase and that if these loans were to be repaid they would have to be repaid from the sale of assets of the Raymond Group.

149. Great American never made any payment on the notes given the borrowing companies and used the Raymond Group assets in repaying its loans obtained from lenders other than IIT in connection with the purchase of Raymond Colliery's stock.

150. Chicago Title Insurance Co., the insurer of the IIT mortgage, removed from its standard title insurance policy form the exclusion clause which would have given it a defense in the event creditors sought to set aside IIT's mortgages as fraudulent conveyances.

151. The exclusion in the Chicago Title Insurance policy was removed in exchange for a promise by Durkin to indemnify Chicago Title if IIT's mortgages were set aside by creditors as fraudulent conveyances.

152. Attorney Bernard Jacobs, counsel for IIT, would have advised IIT not to make these loans if Chicago Title Insurance had not removed the above policy exclusion.

153. Durkin, at the request of Jacobs, advised Chicago Title on November 27, 1973

that some of the loan proceeds were to be used to pay the selling stockholders for their stock with the intent to subject Chicago Title to liability if the IIT mortgages were set aside as fraudulent conveyances.

154. The Anthracite Health and Welfare Fund was established sometime prior to 1973 and was intended to provide for the health of coal miners and former coal miners. Coal producers participating in the Fund, including Blue Coal, paid 5 cents to the Fund for each ton of coal produced.

155. On November 26, 1973, the Raymond Group owed the Anthracite Health and Welfare Fund approximately $1,033,-898.04.

156. On November 26, 1973, the Raymond Group owed the United States government $2,941,761 in delinquent federal income taxes.

157. The federal income taxes owed by the Raymond Group on November 26, 1973, consisted of taxes, penalties and interest for fiscal years ending June 30, 1966, June 30, 1967, June 30, 1968, June 30, 1969, June 30, 1971, June 30, 1972 and June 30, 1973.

158. On November 26, 1973, the Raymond Group owed approximately $1,368,376 in real estate taxes to Lackawanna and Luzerne Counties.

159. On November 26, 1973, the Raymond Group owed $1,146,180 to the Commonwealth of Pennsylvania for backfilling obligations.

160. On November 26, 1973, the Raymond Group owed approximately $2,293,250 to miscellaneous creditors.

161. After November 26, 1973, the Raymond Group lacked the funds to pay its routine expenses including those for materials, supplies, telephone and electricity, and was forced to generate cash towards the payment thereof by liquidating its mining equipment.

162. Within two months after the November 26, 1983 closing, the deep coal mining operations of Blue Coal were shut down.

163. The Gillens and Clevelands knew the deep mines were flooded and were no longer economically feasible to operate. They did not share this knowledge with IIT or Durkin.

164. Within six months after the November 26, 1973 closing, the Raymond Group had ceased substantially all of its strip mining operations.

165. After the Raymond Group terminated its mining operations the Raymond Group was sued for breach of a contract to sell coal because it could no longer supply the coal promised in the contract.

166. The plaintiff in the action mentioned in the preceding paragraph also refused to pay accounts owed the Raymond Group, claiming that the amounts due were set off by the damages owed by the Raymond Group for breach of contract.

167. Within seven months after the November 26, 1973 transaction, the Raymond Group was subjected to a series of injunctions for its failure to perform the backfilling of its strip mines required under Pennsylvania law and failure to pay obligations to the Anthracite Health and Welfare Fund. These injunctions prevented the Raymond Group from moving or selling its equipment until the obligations were satisfied.

### III. Discussion.

#### A. Overview.

The United States seeks to set aside as fraudulent conveyances the mortgages given to IIT by the borrowing companies to secure the IIT loans. The United States also seeks to set aside as fraudulent conveyances the mortgages given to IIT by all companies in the Raymond Group to secure their guarantees of the aggregate $8,530,-000 in loans made by IIT. In his crossclaim, the Trustee, as the representative of the creditors of the bankrupt corporations, seeks relief from the mortgages and guarantee mortgages encumbering the lands of Blue Coal and Glen Nan which is identical to that sought by the United States. Hereinafter, the United States and the Trustee will collectively be referred to as "the Creditors".

■ Specifically, the Creditors allege that the mortgages and guarantee mortgages are fraudulent conveyances under Sections 354, 355, 356, and 357 of the Pennsylvania Uniform Fraudulent Conveyances Act (hereinafter "the Act"), 39 Pa.Cons. Stat. § 351 *et seq.* The decisions of Pennsylvania courts under the Act control. *Commissioner v. Stern,* 357 U.S. 39, 45, 78 S.Ct. 1047, 1051, 2 L.Ed.2d 1126 (1958). Where no Pennsylvania case law exists on certain points, we have interpreted the language of the Act using the case law developed under the Uniform Fraudulent Conveyances Act in other jurisdictions. *See* 39 Pa.Cons.Stat. § 362.

■ Sections 354 and 355 of the Act are commonly referred to as constructive fraud provisions because under each of these two sections the intent and knowledge of the transferor and transferee are not in issue. *Farmers Trust Co. of Lancaster v. Bevis,* 331 Pa. 89, 200 A. 54 (1938). Under Section 354, "every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors ... if the conveyance is made or the obligation is incurred without a fair consideration." 39 Pa.Cons.Stat. § 354. Under Section 355, any "conveyance made without fair consideration, when the person making it is engaged, or about to engage, in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors...." The constructive fraud provisions of the Act require a creditor seeking to set aside a conveyance as fraudulent to show lack of fair consideration, insolvency or under-capitalization. *First Nat'l Bank of Marietta v. Hoffines,* 429 Pa. 109, 114–15, 239 A.2d 458 (1968).

■ Under the Act's constructive fraud provisions, a conveyance will not be set aside as fraudulent if it was made for fair consideration. If the transfer was not made for fair consideration, then, depending upon the financial condition of the transferor at or immediately after the time of transfer, the transfer may be fraudulent.

We will consider the application of the constructive fraud provisions of the Act to the challenged mortgages and guarantee mortgages by first determining whether the Raymond Group received fair consideration in exchange for the mortgages. After reaching the fair consideration issue, we will examine the financial condition of the Raymond Group on or about November 26, 1973.

■ Sections 356 and 357 of the Act are commonly referred to as the Act's intentional fraud provisions. Under Section 356, any conveyance made without fair consideration by one who intends or believes he will incur debts beyond his ability to repay is fraudulent. Under Section 357, any obligation incurred or conveyance made with the intent to hinder, delay, or defraud creditors is fraudulent. Under Section 357, the only inquiry is whether the requisite fraudulent intent existed at the time of the conveyance and whether creditors were in fact prejudiced by the conveyance. *Queen-Favorite Bldg. & Loan Ass'n. v. Burstein,* 310 Pa. 219, 165 A. 13 (1933). *See also United States v. Johnston,* 245 F.Supp. 433, 440 (W.D.Ark.1965). The application of these two provisions of the Act to the conveyances challenged herein will be discussed in Section D of this opinion.

Finally, we will address the Creditors' arguments regarding the liability of the Gillens and Clevelands and the Creditors' claim that the mortgages are void as illegal and ultra vires acts under Pennsylvania law.

B. Fair Consideration.

Fair consideration is defined in Section 353 of the Act as follows:

Fair consideration is given for property or obligation:

(a) When, in exchange for such property or obligation, as a fair equivalent therefor and in good faith, property is conveyed or antecedent debt is satisfied; or

(b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount

not disproportionately small as compared with the value of the property or obligation obtained.

39 Pa.Cons.Stat. § 353.

■ Section 353(a) of the Act is the test of fair consideration against which the consideration received by the Raymond Group in exchange for the obligation to IIT must be measured. The Note Purchase and Loan Agreement requiring the Group to pay IIT $8,530,000 is the obligation given in exchange for the loan proceeds and the obligation to repay the IIT loans must be a "fair equivalent" of the loan proceeds obtained by the Raymond Group.

The initial question under Section 353(a) is whether the transferee, IIT, transferred its loan proceeds in good faith. *See Cohen v. Southerland*, 257 F.2d 737 (2d Cir.1958); *Inland Security Co., Inc. v. Estate of Kirshner*, 382 F.Supp. 338 (W.D.Mo.1974). IIT knew or strongly suspected that the imposition of the loan obligations secured by the mortgages and guarantee mortgages would probably render insolvent both the Raymond Group and each individual member thereof. In addition, IIT was fully aware that no individual member of the Raymond Group would receive fair consideration within the meaning of the Act in exchange for the loan obligations to IIT. Thus, we conclude that IIT does not meet the standard of good faith under Section 353(a) of the Act. *See e.g., Cohen v. Southerland*, 257 F.2d at 742 (transferee's knowledge that the transferor is insolvent defeats assertion of good faith); *Epstein v. Goldstein*, 107 F.2d 755, 757 (2d Cir.1939) (transferee's knowledge that no consideration was received by transferor relevant to the issue of good faith).

The second question to be resolved under Section 353(a) is whether the obligation received by IIT was the fair equivalent of the loans to the borrowing companies. (Parenthetically, we note that the Creditors seek to set aside the conveyance of the mortgages and guarantee mortgages which served as collateral for the loan obligations and not the obligations themselves. However, we will examine whether the obligations were supported by fair consideration. If not, the mortgages to secure the same were also not supported by fair consideration.)

The obligation received by IIT was in the amount of $8,530,000. Defendants argue that in exchange for this obligation, the borrowing companies received a loan collectively totalling $7,000,000 and that this amount was a fair equivalent of the $8,530,000 aggregate loan principal they agreed to repay. Defendants further argue that there was in fact no disparity in amount between the obligations incurred and the benefits received because the $1,530,000 difference between the proceeds received by the borrowing companies and the amount owed IIT was placed in an interest reserve and would be applied to the interest as it accrued on the loans.

■ The borrowing companies appeared to receive fair consideration within the meaning of Section 353(a) of the Act despite the disparity between the obligations incurred and the actual proceeds received. *See e.g., People-Pittsburgh Trust Co. v. Holy Family Polish National Church*, 341 Pa. 390, 393, 19 A.2d 360 (1941). However, the issue of whether fair consideration was received by the Raymond Group must be examined from the point of view of the Raymond Group's creditors. *Larrimer v. Feeney*, 411 Pa. 604, 609, 192 A.2d 351 (1963). As IIT's attorneys structured the loan transaction, an escrow account was created into which the IIT loan proceeds were deposited. Very large portions of the loan proceeds were then lent by the borrowing companies to Great American. In exchange for the loans to Great American, each borrowing company received an unsecured promissory note from Great American in which Great American promised to repay the loans in accordance with the same terms and conditions under which the borrowing companies were to repay the loans to IIT (i.e. interest at 5 points over the prime rate and repayment of the principal within three years).

■ The Defendants argue that the Great American notes executed in favor of

each borrowing company were valuable assets each borrowing company purchased with the IIT loan proceeds. This argument is specious because all parties to the IIT loan knew as of November 26, 1973 that the Great American notes would not and could not be paid in accordance with their terms. Indeed, no payment was ever made to the borrowing companies on the Great American notes. Great American was solely a holding company which owned the stock of Raymond Colliery and Olyphant. Under the Agreement with IIT, Great American covenanted to remain a holding company until the IIT loans were paid off. The only sources of income to Great American were the sale of Raymond Colliery or Olyphant stock which Great American had covenanted under the Agreement not to sell or the receipt of dividends from Raymond Colliery or Olyphant which Raymond Colliery and Olyphant had covenanted under the Agreement not to declare. Because Great American could not and in fact did not repay the notes to the borrowing companies in accordance with their terms, these notes cannot be considered as valuable assets obtained by the borrowing companies from the IIT loan proceeds. The $4,085,000 in IIT loan proceeds which were lent immediately by the borrowing companies to Great American were merely passed through the borrowers to Great American and ultimately to the selling stockholders and cannot be deemed consideration received by the borrowing companies.

Raymond Colliery received $2,590,000 in loan proceeds from IIT and immediately and as part of the overall transaction lent $2,575,500 to Great American. Approximately $14,400 of the remaining funds were used by Raymond Colliery to pay delinquent real estate taxes. While the $14,400 was a genuine benefit to Raymond Colliery, it was one that was not a fair equivalent of the $3,156,100 loan obligation to IIT undertaken by Raymond Colliery.

Blue Coal received $4,270,000 in loan proceeds from IIT and immediately and as part of the overall transaction lent $1,370,-000 to Great American. Because Blue Coal was left with $2,522,527 in IIT loan proceeds which it applied in satisfaction of antecedent debts, the Defendants argue that the benefit received by Blue Coal was a fair equivalent of the obligation it undertook to repay IIT $5,203,300. Of the $2,522,527 in IIT loan proceeds retained by Blue Coal after the loan to Great American, $2,186,427 was used to satisfy a Chemical Bank mortgage owed by Blue Coal and secured by a first lien on its lands, $20,000 was used to pay delinquent real estate taxes, $315,000 was used to redeem a pledge to Glen Alden of Blue Coal stock and $100 was used to pay unspecified "fees."

The United States disputes the conclusion that all of these expenditures inured to the benefit of Blue Coal. Even assuming that both the satisfaction of the Chemical Bank mortgage and the other payments in fact inured to the benefit of Blue Coal, we are of the opinion that taken as a whole the benefit received by Blue Coal was not a fair equivalent of the obligation it gave to IIT. Thus, Blue Coal did not receive fair consideration from IIT.

Finally, Glen Nan and Olyphant each received $70,000 in loan proceeds from IIT and each lent the entire amount to Great American. As the Great American notes cannot be considered any real benefit to Glen Nan or Olyphant, neither received fair consideration in exchange for the obligations to IIT.

Defendants argue that the Raymond Group in fact had the benefit of all the IIT proceeds because those proceeds lent to Great American were used to benefit the Raymond Group. Great American applied the $4,085,500 of IIT loan proceeds it received as loans from the borrowing companies towards the purchase of Raymond Colliery's stock. The $4,085,500 was commingled in the escrow account with $3,633,837 in other funds. Several contemporary writings by persons involved in the transaction show that these funds were used by Durkin to purchase Raymond Colliery's stock. Thus, we conclude that the entire amount of $4,085,500 was applied towards the purchase price of Raymond Colliery's stock.

Defendants suggest that the use of the proceeds to purchase Raymond Colliery's stock was a benefit to the borrowing companies because it resulted in their obtaining new management. We are of the opinion that new management does not fall within the definition of fair consideration in the Act. Because of the comparisons required under both Sections 353(a) and 353(b) we believe that the drafters thereof intended consideration to mean only consideration with a monetary value. We also have not found any authority in any jurisdiction to support the argument that new management can be considered fair consideration under the Uniform Fraudulent Conveyances Act. Additionally, even assuming new management may constitute fair consideration, it clearly cannot be so considered in this case. The new management received by the borrowing companies consisted of James and Anna Jean Durkin and Hyman Green. None of these individuals had experience in managing large coal operations and large-scale sales of real estate and in fact operated these companies with disastrous results. The new management was not sufficiently valuable consideration so as to sustain the loans.

We note the argument of the United States that, even assuming fair consideration was received by the Raymond Group under Section 353(a), the conveyances by the Raymond Group of encumbrances to secure the IIT obligation were not supported by fair consideration within the meaning of Section 353(b). IIT encumbered all assets of the Raymond Group to secure its loans and the guarantees thereof and the United States argues that the value of the encumbered assets was grossly in excess of the present advance. *See Commonwealth Trust Co. v. Reconstruction Fin. Corp.*, 120 F.2d 254 (3d Cir.1941). Because we find that the obligation received by IIT was not supported by fair consideration under Section 353(a) of the Act, we need not reach the question of whether the conveyances by the Raymond Group of encumbrances to secure the loan were supported by fair consideration under Section 353(b).

An additional question which must be addressed is whether IIT gave fair consideration to those companies which executed guarantee mortgages for the full amount of the IIT loans. The borrowing companies were primarily liable on the notes and loans by IIT. As we have already determined, the borrowing companies did not receive fair consideration in exchange for the IIT loan obligations. They received no additional consideration for the guarantee mortgages. Therefore, the borrowing companies did not receive fair consideration in exchange for the guarantees they executed with respect to the aggregate amount of the IIT loan of $8,530,000.

Those guarantors of the IIT loans who were not borrowing companies were, in essence, only secondarily liable on the IIT notes and loans. Nonetheless, despite the contingent nature of their obligations, the guarantees are clearly "obligations incurred" under the Act, *see Zellerback Paper Co. v. Valley Nat'l. Bank,* 13 Ariz.App. 431, 477 P.2d 550 (1970); *Roxbury State Bank v. The Clarendon,* 129 N.J.Super. 358, 324 A.2d 24, *cert. denied,* 66 N.J. 316, 331 A.2d 16 (1974), and the mortgages collateralizing the guarantees are clearly conveyances under the Act. 39 Pa.Cons. Stat. § 351. No consideration at all flowed to the guarantors who were not borrowing companies. Indeed, no Defendant has advanced even a colorable argument that any guarantor received any valuable consideration. The only conceivable benefit these guarantors could have received in exchange for their guarantee mortgages was the closing of the IIT loan to the borrowing companies. The IIT loan resulted in new management for the guarantors and certain related theoretical indirect benefits. As discussed earlier, new management cannot be considered an element of fair consideration under the Act. Additionally, as to those guarantors who were not also borrowing companies, there is absolutely no evidence that they received any direct or indirect benefit at all from the loans to the borrowing companies. None of the loan proceeds trickled down to the guarantors. In addition, re-

ceipt of the IIT loan proceeds did not strengthen the financial position of the guarantors' parent corporations. Thus the guarantors received no benefit under a theory that the execution of the guarantees inducing IIT to make the loans to the borrowers benefitted the guarantors by strengthening the financial position of the Raymond Group as a whole. We therefore conclude that the benefit received by the guarantors was not a fair equivalent of the obligation incurred to IIT.

For the above reasons, we find that the obligations incurred by the Raymond Group and its individual members to IIT were not supported by fair consideration. The mortgages and guarantee mortgages to secure these obligations were also not supported by fair consideration.

C. The Financial Condition of the Raymond Group.

The second issue to be considered under the constructive fraud provisions of the Act relates to the financial condition of the transferor at the time of and immediately after the challenged conveyance was made or obligation incurred.

■ Each constructive fraud provision of the Act requires a different showing as to the financial condition of the transferor before a conveyance will be set aside. Section 354 requires an inquiry into whether the transferor was insolvent at the time the obligation was incurred or conveyance made or was rendered insolvent thereby. Section 355 requires an inquiry as to whether the property remaining in the transferor's possession after the conveyance was an unreasonably small amount of capital for the business in which it was engaged.

There is a dispute between the Creditors and the Defendants as to who has the burden of proof on the issue of the solvency of the Raymond Group. The Creditors argue that the burden of proof on this issue shifted to the Defendants once it was shown a conveyance was made by one having debts. *First Nat'l Bank of Marietta v. Hoffines,* 429 Pa. 109, 114, 239 A.2d 458 (1968). Defendants argue that the burden of proof

would only shift to them under Pennsylvania law if the conveyance being challenged involved a transfer between related parties. Our review of Pennsylvania law indicates that once a creditor shows a conveyance was made or an obligation incurred without fair consideration by one in debt, the duty shifts to the transferree or obligee to prove the debtor was solvent. *Baker v. Geist,* 457 Pa. 73, 321 A.2d 634 (1974); *Farmers Trust Co. v. Bevis,* 331 Pa. 89, 200 A. 54 (1938). While the burden of proof on the issue of solvency rested with the Defendants, we are of the view that, even had the burden been on the Creditors, that burden would have been more than amply met by the evidence presented by the United States.

■ One other preliminary matter relates to whether the solvency of the Raymond Group should be determined by examining the Raymond Group as a whole or by examining the individual members thereof. Because the business of the Raymond Group was conducted as though the Raymond Group was a single entity and because the Defendants urged the Court not to look at the solvency of individual Raymond Group members, *e.g.,* 68 Trial Transcript 42, we will deal only with the financial position of the Raymond Group as a whole and not in terms of its individual parts.

The question is whether the Raymond Group was solvent on November 26, 1973 immediately before the transaction and immediately thereafter. *Angier v. Warrell,* 346 Pa. 450, 31 A.2d 87 (1943). The Act defines solvency as follows:

> A person is insolvent when the present, fair, salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

39 Pa.Cons.Stat. § 352(1).

"Debts" are defined under the Act as "any legal liability whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." 39 Pa.Cons. Stat. § 351. The "assets" of a debtor in-

clude all property not exempt from liability for his debts. 39 Pa.Cons.Stat. § 351. Because the debtors in this case are corporations, none of their property was exempt from liability for their debts under bankruptcy or other law. Therefore, all assets of the Raymond Group are to be considered in determining whether or not it was solvent on November 26, 1973 or immediately thereafter.

In assessing the solvency of the Raymond Group, all of its existing debts must be considered. This includes not only those debts which were absolute and matured on November 26, 1973, but also those debts which were liabilities on November 26, whether "matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." 39 Pa.Cons.Stat. § 351. *See Baker v. Geist,* 457 Pa. 73, 321 A.2d 634 (1974); *Continental Bank v. Marcus,* 242 Pa.Super. 371, 363 A.2d 1318 (1976).

The debts of the Raymond Group that were matured on November 26, 1973 totalled in excess of $8,700,000. In addition, the Group had an $8,530,000 obligation to IIT. Further, Great American borrowed $3,500,000 from lenders other than IIT to finance its purchase of Raymond Colliery's stock. Great American had no source of income and intended to use the assets of the Raymond Group to pay the interest and principal on the above loans. These debts therefore constitute an obligation of the Raymond Group. Based on the above, we conclude that the Raymond Group had existing debts of at least $20,000,000 on November 26, 1973.

■ These debts of the Raymond Group are to be compared to the "present, fair, salable value" of the Raymond Group's assets. 39 Pa.Cons.Stat. § 362. The phrase means that value which can be obtained if the assets are liquidated with reasonable promptness in an arms-length transaction in an existing and not theoretical market.

This meaning of the phrase "present, fair, salable value" is in accord with the interpretation given thereto by the Pennsylvania Supreme Court in *Larrimer v. Feeney,* 411 Pa. 604, 192 A.2d 351 (1963), wherein it stated:

A reasonable construction of the . . . statutory definition of insolvency indicates that it not only encompasses insolvency in the bankruptcy sense, i.e., a deficit net worth, but also includes a condition wherein a debtor has insufficient presently salable assets to pay existing debts as they mature. If a debtor has a deficit net worth, then the present salable value of his assets must be less than the amount required to pay the liability on his debts as they mature. A debtor may have substantial paper net worth including assets which have a small salable value, but which if held to a subsequent date could have a much higher salable value. Nevertheless, if the *present* salable value of his assets are [sic] less than the amount required to pay existing debts as they mature, the debtor is insolvent.

*Larrimer v. Feeney,* 411 Pa. at 608, 192 A.2d at 197 (emphasis in the original, citation omitted).

Pennsylvania state courts and federal courts have consistently taken the position that the test of solvency under the Act is the *present ability* to pay one's debts as they mature, *see United States v. St. Mary,* 334 F.Supp. 799, 802 (E.D.Pa.1971), and a debtor will not be considered solvent under the Act merely because he is still able to trade on credit or has assets with a fair market value which would permit him to pay his debts at some future time upon a liquidation of his business. *Larrimer v. Feeney,* 411 Pa. at 608, 192 A.2d at 197; *Fidelity Trust Co. v. Union Bank,* 313 Pa. 467, 475, 169 A. 209 (1933), *cert. denied,* 291 U.S. 680, 54 S.Ct. 530, 78 L.Ed. 1068 (1934) (error to consider fair salable value instead of present fair salable value—"present" may not be disregarded). *See also In re Franklin Nat. Bank Securities Litigation,* 2 B.R. 687, (Bkrtcy.E.D.N.Y.1979), *aff'd,* 633 F.2d 203 (2d Cir.1980); *Glenmore Distilleries Co. v. Seideman,* 267 F.Supp. 915 (E.D. N.Y.1967); *Chase Nat. Bank v. U.S. Trust Co.,* 236 App.Div. 500, 260 N.Y.S. 40 (1st Dep't 1932).

No party to this litigation disputes that the assets of the Raymond Group had tremendous value in 1973. The Raymond Group had substantial lands in the Wilkes-Barre-Scranton area of Pennsylvania which were rich in anthracite coal reserves. The Raymond Group owned valuable equipment used in the mining and processing of coal as well as valuable culm banks. The Raymond Group's vast lands, culm banks, and coal reserves were, however, highly illiquid assets which could not be sold except over an extended period of time. We are therefore of the opinion that the present fair salable value of the Raymond Group's lands, culm banks, and coal reserves as of November 26, 1973 did not exceed or even approach the Raymond Group's debts and could not produce enough cash to pay the debts of the Raymond Group as they matured.

The fact that the assets were illiquid and could not be sold to produce cash to pay the Raymond Group's debts as they matured is not dispositive of the issue of solvency. A company with highly illiquid assets would not be insolvent if the operation of its business produced sufficient cash for the payment of its debts as they matured.

The coal production business of the Raymond Group clearly could not produce a sufficient cash flow to pay the company's obligations in a timely manner. The coal business of the Raymond Group had been unprofitable since 1969. There was no reasonable basis for a belief that the coal business would become profitable after November 26, 1973, without a significant rise in coal prices and a substantial capital investment to make the coal operations of the Raymond Group more efficient. While coal prices did rise in 1973 in large measure because of the oil embargo, the increase in prices was not enough to turn around the desperate financial condition of the Raymond Group. Furthermore, there was no capital available to the Raymond Group to invest in equipment to make the coal operations more efficient.

The sale of the Raymond Group's surplus lands had provided a fairly substantial cash flow to the Raymond Group prior to November 26, 1973. However, this cash flow was abruptly cut off by the IIT agreement which provided that, for the land sales which occurred in 1974 and 1975, IIT would receive a total of $1,832,500 out of the first $2,500,000 of land sale proceeds received by the Raymond Group. The remaining proceeds of $667,500 would be placed by IIT in a "funded reserve" and would be used to pay the Raymond Group's creditors. However, if the lands were taxed as ordinary income to the Raymond Group, which was exceedingly likely and in fact came to pass, each land sale would result in a cash loss to the Raymond Group as the amount of federal taxes due would exceed the funds allocated to the "funded reserve" from that sale. Moreover, no cash would be available for creditors other than IIT, the Ford Motor Credit Co. and Thrift Credit from the sale of surplus lands. Thus, the cash that could be generated by the operation of the Raymond Group's business was grossly insufficient to meet its obligations.

One final matter which must be discussed is the possibility of the Raymond Group liquidating its mining equipment to generate the cash needed to pay its debts. A fairly liquid market for used strip mining equipment existed in 1973. Within 7 months of the IIT loan, the Raymond Group sold two pieces of equipment for $6,000,000. The Defendants produced evidence that all of the equipment of the Raymond Group had a fair market value of between $6,000,000 and $22,000,000. However, there was no evidence to indicate how much of this equipment was strip mining equipment having a present fair salable value in 1973. The fact that a fairly liquid market existed for certain types of used coal equipment does not mean that all equipment owned by the Raymond Group was rapidly salable. In addition, much of this equipment was encumbered by purchase money mortgages on which substantial sums were still owed as well as by the IIT security interests. Furthermore, much of this equipment was not surplus in that it was used for then existing coal operations which would cease if the equipment were sold. It is thus

evident that the proceeds of the sales of such equipment would not necessarily be available to the Raymond Group to pay its debts. Indeed, some of the largest and most valuable pieces of equipment owned by the Raymond Group were clearly not salable. One example is the Huber Breaker. Despite the substantial value of the Huber Breaker under proper market conditions, it could not be operated efficiently at 1973 coal prices and, consequently, had a low present, fair, salable value on November 26, 1973. While some of the equipment owned by the Raymond Group could rapidly be liquidated in the used equipment market, there is no evidence that the Raymond Group owned enough of such equipment to permit it to meet its existing debts as they matured.

We are of the opinion that the Raymond Group was insolvent on November 26, 1973 as a result of the IIT transaction and the instantaneous payment to the selling stockholders of a substantial portion of the IIT loan in exchange for their stock.

We are also of the opinion that the delivery of the mortgages and guarantee mortgages to IIT occurred when the Raymond Group was engaged or about to engage in a "business or transaction for which the property remaining in [its] hands after the conveyance is an unreasonably small capital." 39 Pa.Cons.Stat. § 355. Both before the November 26, 1973 transaction as well as thereafter, the Raymond Group did not have the capital resources it needed to carry on its business. Moreover, Durkin planned to continue selling the surplus lands of the Raymond Group and would therefore incur additional income tax liabilities to the United States. The provisions of the Note Purchase and Loan Agreement were such that relatively little, if any, proceeds of the land sales would be available for general creditors. Durkin also planned to continue the Raymond Group's coal mining operations and would therefore incur additional liabilities to trade creditors, the Anthracite Health and Welfare Fund, and the Commonwealth for backfilling obligations. Moreover, the law under Section 355 of the Act as it has been developed in other juris-

dictions is that a finding of insolvency is *ipso facto* a finding that the debtor was left with unreasonably small capital after the conveyance. *Wydett v. George,* 336 Mass. 746, 148 N.E.2d 172 (1958); *Holcomb v. Nunes,* 132 Cal.App.2d 776, 780–81, 283 P.2d 301 (1955).

### D. Intentional Fraud.

Section 357 of the Pennsylvania Uniform Fraudulent Conveyances Act provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present or future creditors.

39 Pa.Cons.Stat. § 357.

The requisite intent under § 357 must be shown by clear and convincing evidence. *Iscovitz v. Filderman,* 334 Pa. 585, 6 A.2d 270 (1939). Moreover, a conveyance will not be set aside under § 357 if the transferree, in this case IIT, was without knowledge of the fraud and paid a fair consideration for the conveyance. *Godina v. Oswald,* 206 Pa.Super. 51, 211 A.2d 91 (1965).

Where the transferor and transferee have knowledge of the claims of creditors and know that the creditors cannot be paid and where consideration is lacking for the transfer the Court may infer an intent to hinder, delay, or defraud creditors. *Godwina v. Oswald,* 206 Pa.Super. 51, 211 A.2d 91 (1965); *Commonwealth Trust Co. of Pittsburgh v. Reconstruction Finance Corp.,* 120 F.2d 254 (3d Cir.1941). *See also United States v. 58th Street Plaza Theatre, Inc.,* 287 F.Supp. 475, 498 (S.D.N.Y.1968); 4 *Collier on Bankruptcy* ¶ 67.37 at 539–43 (14 ed. 1975) (discussing intentional fraud section of the Bankruptcy Act, 11 U.S.C. § 107(d)(2)(D) (1970) ).

As an initial premise, there can be no doubt that the November 26, 1973 transaction had the effect of hindering and delaying the collection efforts of the Raymond Group's creditors. As a result of the No-

vember 26, 1973 transaction, the Raymond Group assumed $11,922,250 in new debt, most of which was owed to IIT. In exchange therefor $3,134,654 of antecedent debts of the Raymond Group were satisfied. The remaining $8,787,596 was used for purposes which were of no benefit whatsoever to the Raymond Group, such as the purchase of the Raymond Colliery stock from the Gillens and Clevelands.

At the time this massive new debt was assumed by the Raymond Group, it was clearly on the brink of insolvency. The Raymond Group had substantial debts it could not pay and shortly after the closing the Raymond Group was forced to close its mining operations and sell its mining equipment in order to generate the cash needed to pay pressing debts. While the Group had historically met its cash flow needs by the sale of its surplus lands, under the terms of the Note Purchase and Loan Agreement the income flowing from the sale of surplus lands was abruptly curtailed. Because of the financial position of the Raymond Group immediately prior to November 26, 1973, the assumption of the IIT obligation secured by mortgages and guarantee mortgages on all of the Raymond Group's assets, and the lack of consideration therefor, we conclude that the IIT obligation had the effect of hindering and delaying other creditors of the Raymond Group.

▇▇▇ The question before us at this point is whether this result was intended by the Raymond Group, acting through James Durkin, its president, and by IIT on November 26, 1973. In our view, this question can be answered by examining the knowledge of the parties on November 26, 1973 as to the financial condition of the Raymond Group. If the parties could have foreseen the effect on creditors resulting from the assumption of the IIT obligation by the Raymond Group, a company in a serious financial condition, the parties must be deemed to have intended the same. *Chorost v. Grand Rapids Factory Show Rooms, Inc.*, 172 F.2d 327 (3d Cir.1949); *In re Process-Manz Press, Inc.*, 236 F.Supp. 333 (N.D. Ill.1964). This is so despite the fact that neither Durkin nor IIT had the motive to hinder or delay creditors. Indeed, Durkin's motive was to purchase the Raymond Group's stock, and IIT's motive was to engage in a profitable loan transaction.

▇▇▇ Neither James J. Durkin Sr. nor IIT had full access to the financial records of the Raymond Group and therefore neither can be charged with knowledge of the minutae relating to the financial condition of the Raymond Group. However, each was aware that the Raymond Group, while rich in assets, had difficulty generating cash. Durkin was informed by his financial advisor and accountant, Charles Parente, on July 13, 1973, after Parente's review of the Raymond Group's financial records, that the Raymond Group had "not reflected sufficient profits and cash flow to cover debt equivalent to the purchase price of the stock over a reasonable period of time." Plaintiff's Exhibit 883. Durkin also knew that the Raymond Group had substantial liabilities which would have to be met after the loan closing. Indeed, virtually every professional Durkin dealt with in this loan transaction who knew of the Raymond Group's substantial liabilities, including Durkin's counsel, Rosenn, Jenkins, and Greenwald, his financial advisor, Charles Parente, and Hoffa's attorney, Eugene Zafft, warned Durkin that he was taking a very substantial risk in purchasing the Raymond Group through the proposed method of financing.

IIT must also be charged with knowledge that the Raymond Group had an inadequate supply of cash needed to carry on its business. Almost every witness who was involved with IIT during this period testified that one problem with the loan was that, while it could adequately be secured, no one knew how the company could generate the cash to repay the loan. This knowledge was what led to the creation of the "interest reserve" fund of $1,530,000. IIT, by creating this fund, intended to relieve the companies from current interest payments on the loan. The loan principal was not amortized and presumably IIT believed that over the next three years the Raymond

Group could somehow liquidate enough assets to generate the cash needed to pay off the principal.

We note that John Streiker, the IIT loan administrator, predicted that the Raymond Group would suffer a substantial cash loss after the imposition of the IIT loan obligations. Streiker's predictions were based upon the Raymond Group's June 30, 1972, financial statements and not the Raymond Group's June 30, 1973, statements. Furthermore, the 1973 statements, which were made available to IIT on October 31, 1973, painted a far bleaker picture of the Raymond Group's financial position than did the June 30, 1972 financial statements used by Streiker.

IIT was also aware that the Raymond Group had enormous liabilities to the Commonwealth of Pennsylvania, the IRS, the Anthracite Health and Welfare Fund, and trade creditors, and that the land release provisions in the Note Purchase and Loan Agreement would deprive the Raymond Group of a major source of cash for general creditors.

Finally, and of great importance, IIT was aware of how its loan proceeds were to be used. Indeed, IIT's own attorneys structured the entire November 26, 1973, transaction. IIT was aware that the bulk of the loan to the borrowing companies would be used to pay the selling shareholders for their stock. IIT was therefore aware that the borrowing companies would receive no fair consideration as compared to the obligations undertaken to IIT. IIT was also clearly aware that the guarantee obligations were not supported by any consideration. We conclude that IIT knew that the Raymond Group would be rendered insolvent by the November 26, 1973, transaction at least in the equitable sense of being unable to pay its debts as they matured.

Defendants argue that the large cash advance given the Raymond Group by IIT negates any inference of an intentional fraud. We disagree. Defendants also contend that IIT's actions after November 26, 1973, in administering the loan proved its lack of an intent to defraud creditors. Defendants note that in four sales of the Raymond Group's equipment during the three years after November 26, 1973, IIT released its liens and permitted substantial amounts of the sale proceeds to be used to pay unsecured creditors. Specifically, of the $8,679,984 that Defendants contend was received by the Raymond Group after these sales, $3,300,919 was used to pay secured creditors senior to IIT, $3,000,000 was applied to the IIT loan and $2,379,065 was paid to unsecured creditors. However, the Uniform Fraudulent Conveyances Act also makes fraudulent an intent to hinder and delay other creditors and IIT's conduct after November 26, 1973 does not rebut the clear inference of such an intent created by the facts in this case.

Finally, the Creditors have argued that the concealment by Durkin of James Riddle Hoffa's ownership interest in Great American was somehow indicative of an intent to hinder, delay or defraud Raymond Group creditors. There was not a scintilla of evidence that Hoffa's involvement or the concealment thereof was part of a fraudulent scheme as to creditors.

Section 356 of the Act provides:

Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

39 Pa.Cons.Stat. § 356. It is clear that Durkin intended or believed that he would incur debts beyond the Raymond Group's ability to pay as they matured. Durkin had every intention of continuing in the land sale business which would result in inadequate funds to pay federal income tax obligations arising from the sale of land because of release provisions in the Note Purchase and Loan Agreement. In addition, Durkin intended to continue mining coal which would result in additional liabilities to trade creditors, the Commonwealth of Pennsylvania, and the Anthracite Health and Welfare Fund. In light of the $11,000,-

000 in additional debt Durkin caused the Raymond Group to undertake, it is clear that Durkin knew that he would be unable to pay the debts which would arise in the course of doing business. This transaction is fraudulent within the meaning of § 356 of the Act.

E. The Liability of the Gillens and Clevelands.

The United States of America and the Trustee in Bankruptcy seek relief against the Gillens and Clevelands, the former shareholders, directors, and officers of the Raymond Group, on the theories that the payment of the stock purchase price was a fraudulent conveyance and that the Gillens and Clevelands breached a duty owed in their capacity as officers, directors, and controlling shareholders to the Raymond Group and its creditors. The Gillens and Clevelands defended against the creditors' claims primarily on the basis that the companies were solvent at the time the stock purchase price was paid. In addition, the Gillens and Clevelands allege that they had no knowledge of the source of the purchase price for their Raymond Colliery stock nor any reason to believe that the source of that purchase price was assets of the Raymond Group. As such, the Gillens and Clevelands claim they breached no duty owed to either the companies or the companies' creditors.

On April 12, 1983, this Court ordered additional briefing on the question of the liability of the Gillens and Clevelands. The Court also ordered briefing on the defense raised by the Gillens and Clevelands that the statute of limitations had run as to the Creditors' claims.

We are of the opinion that the statute of limitations does not bar this action. While the Pennsylvania statute of limitations which governs the causes of action alleged by the Creditors against the Gillens and Clevelands has run, 42 Pa.Cons.Stat. § 5527 (6 years), the United States is seeking in this action to enforce rights held in its governmental capacity. Therefore, the state statute of limitations does not apply and the United States can proceed against

the Gillens and Clevelands provided it made timely assessments against the taxpayers, 26 U.S.C. § 6501, and timely brought suit to reduce the same to judgment. 26 U.S.C. § 6502. These two requirements have been met and the United States is therefore not barred from seeking relief against the Gillens and Clevelands. *See United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *United States v. Parker House Sausage Co.*, 344 F.2d 787 (6th Cir.1965); *United States v. Atlantic Richfield Co.*, 73–1 T.C. ¶ 9437 (E.D.Pa. 1973).

The Trustee is empowered under the Bankruptcy Act, 11 U.S.C. § 110(e) (1970), to assert the rights of any actual creditor of the bankrupt on the date of bankruptcy. As the United States is a creditor of Blue Coal and Glen Nan and has a cause of action which is not time-barred against the Gillens and Clevelands as former officers, directors, and shareholders of Blue Coal and Glen Nan, the Trustee's claim asserted on behalf of the United States is likewise not barred. *Feldman v. First National City Bank*, 511 F.2d 460 (2d Cir.1975); *In Re Dee's, Inc.*, 311 F.2d 619 (3d Cir.1962). In addition, a second creditor of Blue Coal and Glen Nan, the Commonwealth of Pennsylvania, also has a claim which is not barred by the statute of limitations. *Comm., Dept. of Trans. v. J.W. Bishop Co.*, 497 Pa. 58, 439 A.2d 101 (1981) (stating that the doctrine of *nullum tempus occurrit regi* is applicable where the statute of limitations is asserted as a defense to claims by the state).

Thomas and John Gillen were officers of Raymond Colliery from 1966 until November 26, 1973. Also during that period, members of the Gillen and Cleveland families sat on Raymond Colliery's board of directors. The Gillens and Clevelands were the sole shareholders of Raymond Colliery prior to November 26, 1973.

As officers and directors of Raymond Colliery on November 26, 1973, the Gillens and Clevelands had a duty under Pennsylvania law to hold these positions "in good faith and with that diligence, care and

skill which ordinary prudent men would exercise under similar circumstances." 15 Pa.Stat. § 1408. *See Rivoli Theatre Co., Inc. v. Allison,* 396 Pa. 343, 152 A.2d 449 (1959); *Howell v. McCloskey,* 375 Pa. 100, 99 A.2d 610 (1953); *Bailey v. Jacobs,* 325 Pa. 187, 194, 189 A. 320 (1937).

 As controlling shareholders of Raymond Colliery, the Gillens and Clevelands were under a duty not to transfer their shares of Raymond Colliery stock "if the circumstances surrounding the proposed transfer are such as to awaken suspicion and put a prudent man on his guard" that the consequences of the transfer would injure the corporation or those interested therein. *Insuranshares Corp. v. Northern Fiscal Corp.,* 35 F.Supp. 22, 25 (E.D.Pa. 1940). *See also Treadway Co., Inc. v. Care Corp.,* 638 F.2d 357, 377 n. 38 (2d Cir.1980); *Estate of Hooper v. Gov't of the Virgin Islands,* 427 F.2d 45 (3d Cir.1970); *Vulcanized Rubber & Plastics Co. v. Scheckter,* 400 Pa. 405, 162 A.2d 400 (1960). A breach of a controlling shareholder's duty not to transfer control of a corporation when such a transfer would injure the corporation is most frequently asserted by minority shareholders in a derivative suit but may also be asserted by creditors existing at the time of such a transfer who are injured thereby. *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1005 (3d Cir.1973); *In Re Complete Drywall Contracting Inc.,* 11 B.R. 697 (Bkrtcy.E.D. Pa.1981); *Bellis v. Thal,* 373 F.Supp. 120 (E.D.Pa.1974); *Stony Brook Lumber Co. v. Blackman,* 286 Pa. 305, 133 A. 556 (1926). The United States was clearly a creditor of the Raymond Group on the date the Gillens and Clevelands sold their stock and therefore has standing to complain of their transfer of control. In addition, the Trustee, as representative of the creditors of Blue Coal and Glen Nan on November 26, 1973, has standing to complain of the transfer of control by the Gillens and Clevelands.

 It was proven beyond any doubt at trial that the Gillens and Clevelands knew as of November 26, 1973 that the money tendered by Durkin to purchase Raymond Colliery stock was obtained from the IIT loan proceeds given the Raymond Group and secured by the assets of the Raymond Group. The Gillens and Clevelands also knew the IIT loan would be repaid with the Raymond Group's assets. The Gillens and Clevelands were fully aware of how the November 26, 1973, transaction was structured. Additionally, the Gillens and Clevelands as the owners and operators of the Raymond Group companies were well aware of the Raymond Group's substantial liabilities to various creditors. Indeed, this awareness coupled with the poor earnings of the Group, precipitated the decision of the Gillens and Clevelands to sell their stock.

We are of the view that as controlling shareholders, the Gillens and Clevelands breached their duty to creditors by accepting payment for their stock from the assets of the Raymond Group. These assets consisted of $4,085,500 in loan proceeds which were funnelled through the Raymond Group to Great American and applied to the purchase price of Raymond Colliery stock. *See Stony Brook Lumber Co. v. Blackman,* 286 Pa. 305, 133 A. 556 (1926). This transaction, in light of the serious financial condition of the Raymond Group, clearly harmed not only the corporations but also its existing creditors.

The United States and the Trustee have asserted two additional theories of liability against the Gillens and Clevelands. The first theory is that the payment of the stock purchase price can be likened to an improperly declared dividend or distribution by Raymond Colliery to its shareholders. The second theory is that the transfer of the stock purchase funds was a fraudulent conveyance under the Pennsylvania Fraudulent Conveyances Act.

 As to the argument that the payment of the stock purchase price should be likened to an improperly declared dividend or distribution, the directors of the corporation who declared payment of the same can be held liable to creditors of the corporation injured thereby. *West v. Hotel*

*Pennsylvania,* 148 Pa.Super. 373, 25 A.2d 593, 595 (Pa.Super.1942). The director who allegedly declared the improper dividend or distribution was James Durkin, Sr. and he was put in the position to make the distribution by the Gillens and Clevelands as part of the whole transaction. Because the Raymond Group's capital was impaired on November 26, 1973, the declaration of the distribution or dividend was clearly illegal under Pennsylvania law. *See Levin v. Pittsburgh United Corp.,* 330 Pa. 457, 199 A. 332 (1938). Therefore, the Gillens and Clevelands can be held accountable for the amount of the dividend or distribution.

 The fraudulent conveyance theory of liability asserted by the creditors has substantial merit. As developed earlier, a conveyance is fraudulent under § 354 of the Pennsylvania Uniform Fraudulent Conveyances Act if it is made without fair consideration by one who is or was thereby rendered insolvent. A transfer of funds is clearly a conveyance under the Act. 39 Pa.Cons.Stat. § 351; *Toff v. Vlahakis,* 380 Pa. 512, 112 A.2d 340 (1955). The Raymond Group was insolvent on November 26, 1973. In addition, no plausible argument has been made or indeed could be made that the Raymond Group received fair consideration for the transfer of its assets to the Gillens and Clevelands. We are of the view that those IIT loan proceeds which were funnelled out of the Raymond Group and applied to the purchase price of Raymond Colliery's stock constituted a fraudulent conveyance under § 354 of the Act.

**F. Ultra Vires.**

 The creditors assert that the various transactions participated in by the Raymond Group companies on November 26, 1973 are invalid because their officers and directors acted beyond the scope of their actual or apparent authority when causing the corporation to participate in the transactions. Even assuming the Board of Directors of the Raymond Group exceeded the corporation's power to mortgage its assets, Section 1303(B) of the Pennsylvania Business Corporate Law provides that "[N]o conveyance or transfer by or to a corporation of property, real or personal, of any kind or description, shall be invalid or fail because . . . the board of directors or any of the officers of the corporation, acting within the scope of the actual or apparent authority given to them by the Board of Directors, have exceeded any of the corporation's purposes or powers." 15 Pa.Cons. Stat. § 1303(B). We are therefore of the view that the theory of ultra vires is not available to the Creditors in this action.

**IV. Conclusions of Law.**

1. This Court has jurisdiction over this action pursuant to 26 U.S.C. § 7402(a) and § 7403 and 28 U.S.C. § 1340 and 1345.

2. The United States is a present creditor of the Raymond Group within the meaning of 39 Pa.Cons.Stat. § 351 *et seq.* for tax liabilities incurred for fiscal years ended June 30, 1966, June 30, 1967, June 30, 1968, June 30, 1969, June 30, 1972, and June 30, 1973.

3. The United States is a future creditor within the meaning of 39 Pa.Cons.Stat. § 351 *et seq.* for tax liabilities incurred by the Raymond Group for fiscal year ended June 30, 1975.

4. The Commonwealth of Pennsylvania is a present creditor of the Raymond Group within the meaning of 39 Pa.Cons.Stat. § 351 *et seq.* for tax liabilities incurred prior to November 26, 1973 and is a future creditor within the meaning of 39 Pa.Cons. Stat. § 351 *et seq.* for liabilities incurred after November 26, 1973.

5. On November 26, 1973, the mortgages to IIT given by the Raymond Group were not supported by fair consideration within the meaning of 39 Pa.Cons.Stat. § 353.

6. The Raymond Group was rendered insolvent within the meaning of 39 Pa.Cons. Stat. § 352 by the November 26, 1973, transaction.

7. The conveyances to IIT by the Raymond Group on November 26, 1973 were

conveyances by an insolvent within the meaning of 39 Pa.Cons.Stat. § 354.

8. The November 26, 1973 conveyances to IIT were made by a person in business who was engaged in a business or transaction for which the property remaining in his hands was an unreasonably small capital within the meaning of 39 Pa.Cons.Stat. § 355.

9. The November 26, 1973 conveyances to IIT were made by a person who intended or believed he would incur debts beyond his ability to repay as they matured within the meaning of 39 Pa.Cons.Stat. § 356.

10. The November 26, 1973 conveyances to IIT were made with actual intent to hinder and delay present or future creditors of the Raymond Group within the meaning of 39 Pa.Cons.Stat. § 357.

11. The acceptance by the Gillens and Clevelands of funds in payment of the purchase price of Raymond Colliery stock from corporate assets was a breach of their obligation to the Raymond Group's creditors.

12. The funds conveyed by Raymond Colliery to the Gillens and Clevelands for their stock were made without fair consideration and by an insolvent within the meaning of 39 Pa.Cons.Stat. § 354.

13. The acceptance by the Gillens and Clevelands of funds in payment of the purchase price of Raymond Colliery stock from corporate assets was receipt of an improperly declared distribution.

An appropriate order will be entered in due course at the conclusion of the trial.