IRVING WIDETT, trustee in bankruptcy, *vs.* ANTHONY C. GEORGE & another.

Suffolk.   November 4, 1957. — February 12, 1958.

Present: WILKINS, C.J., RONAN, SPALDING, COUNIHAN, & WHITTEMORE, JJ.

*Fraudulent Conveyance. Bankruptcy,* Trustee's rights.

Following the making of an agreement, not obligating a restaurant corporation, for sale and purchase of all its stock, whereby the value of some of its inventory to be retained by it was to be paid as part of the purchase price and certain liquors were to be transferred to and become the property of the seller, payments by the corporation to the seller on account of the value of the inventory retained by it and the transfer to him of the liquors were without consideration with respect to the uniform fraudulent conveyance law, G. L. (Ter. Ed.) c. 109A. [748–749]

Evidence showed that, in the circumstances, a restaurant corporation, which was profitably operated up to and for a while after a time when its management changed through a sale of all its stock and at that time had valuable assets and good prospects as a going concern, was not left with "an unreasonably small capital" within G. L. (Ter. Ed.) c. 109A, § 5, by certain payments and a transfer of property made by it without fair consideration shortly after that time, but that the contrary was the result of further payments made without fair consideration after a period of several months in which it had lost money steadily and depleted its resources in discharge of a mortgage obligation. [751–752]

A trustee in bankruptcy seeking to recover certain amounts paid by the bankrupt to the defendant on the ground that the payments were fraudulent conveyances within G. L. (Ter. Ed.) c. 109A, § 5, as leaving the bankrupt with "an unreasonably small capital" was not barred by the facts that the bankruptcy did not occur until nearly three years after the payments and that the debts of the bankrupt existing at the times of the payments were satisfied before it occurred.  [752, 754]

BILL IN EQUITY, filed in the Superior Court on February 19, 1953.

The plaintiff appealed from a final decree dismissing the bill entered after hearing by *Kirk, J.*

*Joseph Kruger,* (*Sydney Berkman & Reuben Goodman* with him,) for the plaintiff.

*Saul Andelman,* for the defendants, submitted a brief.

WHITTEMORE, J.  This case was tried with *Widett* v. *Pilgrim Trust Co., ante,* page 738.  Certain relevant facts are stated in the opinion in that case.

This was a bill in equity by the trustee in bankruptcy of Tremont Lobster House, Inc., hereinafter called Tremont, filed February 19, 1953, to reach and apply shares of stock owned by one George in Atlantic Lobster House, Inc., hereinafter called Atlantic, in satisfaction of the claim of the trustee under U. S. C. (1946 ed.) Sup. V, Title 11, § 110 (c), and G. L. (Ter. Ed.) c. 109A, § 5.[1]

The claim of the trustee is to recover certain amounts paid, and the value of certain property transferred, to George by Tremont, allegedly without receipt of "fair consideration" therefor.  The payments totaled $11,982.58.  The first payment of $6,000 was made on or about March 24, 1947, and the balance in four checks given between December 1, 1947, and February 28, 1948, inclusive.  Of the total sum, $10,750 was shown by the evidence to have been paid on account of the inventory retained by Tremont under the agreement of March 15, 1947, described in the

---

[1] "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction, for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent."

preceding opinion, whereby three men (the buyers) undertook to buy from George all the capital stock of Tremont. Although the judge found that after the initial payment of $6,000 the balance of "$5,982.58 was paid to George to complete payment on the inventory," we conclude for reasons to be stated that $1,232.58 of this payment was not shown by the evidence to be for inventory, and that it must be separately considered. The subject property was the inventory of liquors which, pursuant to the agreement, was removed by George in March, 1947, about a week after the sale was made. The liquors had a value, as the judge found, of $2,580.

1. Tremont received no consideration for or benefit from the payments for inventory. They were not made to buy inventory for the corporation. The provisions of the agreement are controlling. Tremont already owned the inventory. The agreement[1] fixed a purchase price for the stock of $80,000 plus an amount equal to the cost price of the inventory. The agreement did not bind the corporation to pay any part of that purchase price, except so far as the chattel mortgage, which was to be given by the corporation as described in the preceding opinion, became committed to that payment. The payments discharged no obligation of the corporation and there was no "fair consideration"[2] therefor.

---

[1] "In addition to the sum of Eighty Thousand Dollars ($80,000.) and as part of the purchase price the Buyers agree to pay to the Seller the value of the inventory and stock in trade on hand in the restaurant operated by the Corporation at the date of taking possession. The inventory shall be sold to the Buyers at its cost price. The Buyers agree to take all of the food and food products including condiments, dressings, spices, salt, pepper and other materials used in the preparation of food. The Buyers agree also to purchase all of the beers, wines and liquors in or on the bar and in the retail supply room. The Seller, however, agrees to give to the Buyers one (1) case of Canadian Club Whiskey without charge therefor. Any and all other liquors and wines which the Buyers do not choose to take and pay for are to become the property of the Seller and to be conveyed by the Corporation to the Seller at the time of passing of papers. The Seller shall permit all dishes, glassware, cutlery, cooking equipment and all other restaurant accessories that are now in use in the restaurant operated by the corporation and used in the conduct of the business to remain on the premises as the property of the Corporation. . . ."

[2] G. L. (Ter. Ed.) c. 109A, § 3. "Fair consideration is given for property or obligation — (a) When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied . . . ."

2. We think also that Tremont received no consideration for or benefit from the transfer of the inventory of liquors. Substantively the transaction appears in this respect to stand as though Tremont had distributed the liquors to George just prior to the sale. In the view we take of the case, however, it is not necessary to construe the language nicely, or discuss other possible construction.

3. The judge ruled impliedly that the plaintiff had not sustained the burden of showing that Tremont was insolvent at relevant periods after March 17, 1947.[1] We find no error in this ruling. Recovery of each payment on account of inventory and for the transfer of liquors would, therefore, require the conclusion that the property remaining in Tremont's hands, after the payment or transfer, was unreasonably small capital for its business under G. L. (Ter. Ed.) c. 109A, § 5. The trial judge made no express findings or rulings on the issue, having resolved the case on the ruling of equitable estoppel. The evidence is reported and we may apply the law to the facts and dispose of the case. *Lowell Bar Association* v. *Loeb,* 315 Mass. 176, 178. We consider first the payment and the transfer made in March, 1947.

The judge found appropriately on the evidence that the business had been profitably operated under the management of George; that during the first month of operation by the buyers it was operated at a relatively small profit, but that more than a month after the new operation began business started to drop off and "the downward trend from the George standard continued more or less thereafter"; and that until approximately November, 1948, payments to creditors were deferred in order to meet payments due Pilgrim when the buyers, "still hopeful for an improvement in business," borrowed $20,000 personally and "used it to discharge their obligation to Pilgrim on the note." The uncontradicted testimony of accountants showed a loss for the year 1947 of $11,192.37 and that as of December 31,

---

[1] "I am unable to find that Tremont was continuously insolvent from and after March 17, 1947." For comment on this form of ruling, see *Rapp* v. *Lester L. Burdick, Inc., ante,* 438, 439.

1947, Tremont's accounts payable were $15,354.51 and its total cash on hand amounted to $1,285.77.

We do not think that the fact of losses under the buyers' management proves that the property with which Tremont started business was unreasonably small capital. Many businesses with adequate capital lose money and for a variety of reasons, some of which may be manifested significantly on a change of management.

The property in the business was not insubstantial after the two transfers to George had been made. Measured by the total sale price the business before the sale was worth about $93,000 ($80,000 plus $10,750 plus $2,580). The two transfers to George of March, 1947, reduced this to about $85,000. The property was of course then subject to the mortgage of $55,000. Accumulated current bills as of that time can be disregarded in view of profitable operation in the first month. The mortgage doubtless effectively prevented any substantial new loan on the security of assets, but the mortgaged property nevertheless was substantial as capital property. There was in March, 1947, no certainty that the corporation would be called upon to pay the full amount of the mortgage. The market value of the equity subject to the mortgage is somewhat indicated by the net figure ($30,000±) remaining after deducting the face of the mortgage from the value of the assets of the business as reflected in the purchase price. The buyers by their contract showed that they thought it was worth at least the $25,000 which they agreed to pay for it in cash, and so paid, even if we assume that they, mistakenly, thought that all their other commitments in the contract were liabilities of the corporation to the extent that they would never be called upon to make a further investment.

The market value of the equity, whatever it may have been, is less significant than the fact that the corporation owned and possessed important assets and had the power and right to use them in a business which then had good prospects. These assets included the lease, the liquor license, the good will of a going business which was protected against

the competition of the previous operator, the equipment of the restaurant, a working inventory, and an arrangement for some advertising and for getting lobsters on priority and at, probably, a favorable price. See *Widett* v. *Pilgrim Trust Co., ante,* 738, 740. It is important in appraising the sufficiency of these assets, as of March, 1947, that the business had been profitably operated by George. The accumulation of debts by George up to possibly $40,000 somewhat weakens the force of this finding, but not seriously in the circumstances. The restaurant businesses of George had been operated as his own, and we are not informed how these debts arose.

We do not think that a prudent business advisor could have said to the buyers that the capital with which they, and Tremont, faced the future on April 1, 1947, was unreasonably small, in view of the experience of the previous owner. Salient characteristics of the restaurant business are a prompt turnover of inventories and cash payment by customers. Such a business might anticipate that, if it did not lose money, it could finance current operations from current receipts. We think the plaintiff has not sustained the burden of showing that the capital of this business, judged prospectively, as of about April 1, 1947, was overburdened with liabilities. The implications are otherwise and suggest that, with a profit, the mortgage, which was the principal charge on assets, could have been sustained.

So far as it is a question of fact, we find that the $6,000 payment to George and the transfer of the inventory worth $2,580 did not leave the corporation with unreasonably small capital under G. L. (Ter. Ed.) c. 109A, § 5, and we hold that there was no error in the determination below that these amounts may not be recovered in this suit.

4. The payments for inventory on and after December 1, 1947, stand in different aspect because of the experience of the business in the meantime. We think the facts found by the judge and shown in the evidence establish that the capital of the corporation by December 1, 1947, was unreasonably small for a business which was steadily losing money

and had already depleted its resources by substantial payments in discharge of its mortgage obligation.

Tremont's payments to Pilgrim at closely relevant dates totaled as follows: December 1, 1947, $10,113.16; December 30, 1947, $11,329.69; January 30, 1948, $12,541.21; February 28, 1948, $13,747.74.

The capital needs of the business in late 1947 and in 1948 are suggested in the testimony of one of the buyers as follows: The $6,000 which was paid to George in March, 1947, was taken from the daily receipts and after that "We were practically broke" and "right away we started getting in the hole." The three buyers worked ("more than full time") for Tremont and drew $65 or $75 a week. The rent in 1947 was $600 minimum a month and the payroll around $2,000 a week. Tremont "fell back" on its payables up to "three weeks, or a month at times." "There was a time when we couldn't catch up, so we had to go out and borrow a few dollars and pay the bills that were pressing us, and get a little more credit." The business started at $25,000 to $26,000 a month and fell in the summer to $18,000 to $20,000 and in 1948 and 1949 it was $16,000 to $17,000 a month. Of the $20,000 borrowed when the Pilgrim note was paid off (November, 1948), $15,000 was "paid . . . on the mortgage, and we had about $5,000 to start fresh again." Putting in more cash "didn't help the situation at all. Business was dropping tremendously down again."

The fact that bankruptcy did not come until three years or nearly three years after the payments does not bar recovery. The statute (G. L. [Ter. Ed.] c. 109A, § 5) expressly gives the right "during the continuance of such business." The time interval is an important reason for discounting the fact of bankruptcy in 1950 as evidence of insufficient capital in 1947, and early 1948. There are of course others. We do not know, for example, that more capital was not distributed after 1948. It is not however the bankruptcy, but rather the contemporary evidences of insufficient capital that we find significant and controlling.

The business as it stood at the end of 1947, however it was

affected by the capacities or incapacities of its new mana-
gers, or other factors, did not have enough cash capital to
operate efficiently in the important aspect of paying its bills
currently. As a corporation which had been losing money
it was without a most important capital resource, a power
to borrow on its prospects. It had no reasonable prospect
of borrowing on its property which at December 31, 1947,
remained mortgaged to secure about $43,000. Its only re-
sources for cash were its restaurant receipts and the pros-
pect was that these would become increasingly less available
to recoup its shortage of operating funds as more losses ac-
crued. The possibility that the mortgage would be a fur-
ther drain could not be excluded.

In the circumstances the amount of capital significant for
purposes of the statute cannot be determined merely by
valuing the equity in owned property above the mortgage
lien thereon and the corporation's debts. There is in the
evidence no satisfactory figure for such value at the end of
1947. If we were to assume that Tremont's tangible and
intangible assets were still worth, unencumbered, about
$93,000, the equity in assets (over current debt of about
$16,000 and balance of mortgage lien of about $43,000) was
about $34,000. This figure, however, means little. After
nine months of losses the market value of the business would
presumably have shrunk substantially, and for this business
the equivalent of this equity in cash with which to do busi-
ness with the noncash assets was nil. The demands on such
assets, as Tremont's capital, were greater than would have
been the case had it been making a profit and there was no
means of satisfying those demands.

The payments for inventory were properly charged to
"Officers' Loan Account." There is, however, no evidence
that the payments to George in and after December, 1947,
offset an antecedent debt to the stockholders so that there
was "fair consideration" under G. L. (Ter. Ed.) c. 109A,
§ 3. The only direct evidence as to the state of that ac-
count was that on March 15, 1947, $700 was put in by an

officer for petty cash, an officer was on that date reimbursed $400 for a utility deposit, and on April 11, 1947, $3,087.09 was deposited and credited to the account.

The judge found on uncontroverted evidence that whatever debts Tremont had incurred during the years 1947 and 1948 had been paid by it before the bankruptcy. The fact that the payments which were made did not prejudice then existing creditors is not material under the statute (G. L. [Ter. Ed.] c. 109A, § 5) which provides that the conveyance is fraudulent "as to creditors and as to other persons who become creditors during the continuance of such business . . . ." And see U. S. C. (1946 ed.) Sup. V, Title 11, § 110 (c). There is no evidence of an accretion of new capital after the $5,000 added in the fall of 1948 and we do not think that that contribution was of such a size as to raise questions of whether what was continued was "such business," or whether for other reasons the effect of the transfer as a fraudulent conveyance was vitiated. We intend no suggestion. There is no question of laches. The claim is not asserted in the right of Tremont. That the corporation might have been equitably estopped does not affect the trustee's right to recover.

5. The voucher entries on Tremont's check of December 1, 1947, show "Inventory 4750 Royalties 1232.58 [Total] 5982.58 1st Payment [that is, this check] 2500 Bal Due 3482.58." George testified in explanation of the "royalties" entry, "It seems that I gave them an extension of time . . . or reduced their payments [under the royalty agreement], but I am not sure. But I know they paid me royalties due to the fact, I think, at that time they were anticipating dropping the name The Lobster House. I think that is the story. . . . Q. And you modified that agreement by accepting this amount on December 1, 1947? A. Right."

The one of the three buyers who testified, after some uncertainty in his testimony, left it that "It says . . . royalties, so it must be royalties," and that his recollection was that the payment was for royalties pursuant to the agree-

ment. He also testified that $10,750, roughly speaking, was the amount computed for the inventory. Some of the testimony separately considered could be cited to support the view that the entire payment of December 1, 1947, was for inventory. The second of two relevant findings of the judge[1] appears to so state (inconsistently with the other finding), and the defendant's brief, which is premised on the view that the corporation was paying for items purchased by it, repeats this finding in its statement of facts.[2] But the judge's findings do not resolve the issue on the basis of a choice among conflicting statements and neither party has dealt with the distinction between the effect of the March, 1947, payment and transfer and of the later payments nor with the point under discussion. In the circumstances we rule on the evidence that the trustee has not shown that the December 1, 1947, payment of $1,232.58 was not for a "fair consideration." See *Toy* v. *Green,* 319 Mass. 354, 360; *Boynton* v. *Rees,* 8 Pick. 329. Payment for "royalties" under the agreement of March 15, 1947, could be payment of an obligation of Tremont, even though not then payable. See *Widett* v. *Pilgrim Trust Co., ante,* 738, 740–741. Modification of Tremont's obligation as to royalties would be a corporate concern. Compare *Reardon Importing Co.* v. *Security Trust Co.* 318 Mass. 304.

6. The decree is reversed. A decree is to be entered below adjudging that the plaintiff may recover from George the sum of $4,750 with interest from the date of the bill, and ordering the sale of George's interest in the shares of Atlantic in satisfaction of the indebtedness.

*So ordered, with costs of the appeal*
*to the appellant.*

---

[1] The judge found, "12. Pursuant to the terms of Exhibit 'A,' the buyers agreed to take some $10,750 worth of the inventory . . . . 13. On or about March 24, 1947, the buyers paid George $6,000 on account of the inventory which they had purchased. Subsequently, between December 1, 1947, and January 30, 1948, $5,982.58 was paid to George to complete payment on the inventory . . . ."

[2] The defendant's brief paraphrases finding 13. See note 1 next preceding.