In the Matter of Elizabeth R. ATKINSON, Debtor.

Michael E. KEPLER, Trustee, Plaintiff,

v.

William P. ATKINSON, Defendant.

Michael E. KEPLER, Trustee, Plaintiff,

v.

Martha A. HESTAD, Defendant.

Adv. Nos. 85–0128–7, 85–0129–7.

United States Bankruptcy Court, W.D. Wisconsin.

June 20, 1986.

---

Michael E. Kepler, Madison, Wis., for plaintiff.

Stephen C. Beilke, Kuemmel & Beilke, S.C., Madison, Wis., for defendant.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

Beginning in 1982 the debtor, Elizabeth Atkinson, cosigned with her son, Robert Atkinson, on four different loans at Boscobel State Bank.[1] Robert began to have economic difficulties in 1983 and the notes became overdue. On January 4, 1984, the debtor transferred to her daughter, Martha Hestad, a forty acre tract of real estate in Crawford County. On that same date she transferred an undivided one-half interest in a sixty acre parcel of real estate to her son, William P. Atkinson. Both deeds were recorded on January 10, 1984, with the Register of Deeds for Crawford County, Wisconsin. The defendants have admitted that the transfers were without consideration. On January 27, 1984, Robert filed a chapter 11 petition in bankruptcy and the debtor became liable on her guarantees. On January 29, 1985, the debtor filed her chapter 7 petition in bankruptcy.

The debtor's trustee, under section 544(b)[2] of the Bankruptcy Code, asserts

---

1. The four notes were signed on the following dates for the respective principal amounts:

| | |
|---|---|
| June 4, 1982 | $92,973.93 |
| March 2, 1983 | 5,000.00 |
| May 25, 1983 | 2,500.00 |
| June 20, 1983 | 2,000.00 |

2. 11 U.S.C. § 544(b) provides:

The trustee may avoid any transfer of an interest of the debtor in property or any obli-

three state law causes of action arising under the Uniform Fraudulent Conveyance Act, WIS.STATS. chapter 242. The issues to be considered are:

    1. Was the debtor rendered insolvent by the transfers to her children?

    2. Did the conveyances to her other children render the debtor's assets unreasonably small in relation to her liability on Robert's notes?

    3. Has the trustee established that the debtor made the conveyances in question with actual intent to hinder, delay or defraud the Boscobel State Bank?

## I.

■ The trustee's first cause of action is based on WIS.STAT. § 242.04 which provides in relevant part:

Every conveyance made ... by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

In order to establish liability under section 242.04 of the statutes the trustee must prove 1) a conveyance, 2) made without fair consideration, 3) made by a person who is or will be rendered insolvent thereby. The first two elements have been stipulated to by the defendants. The third element, insolvency, is defined by WIS.STAT. § 242.-02(1) which provides:

A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing

debts as they become absolute and matured.

Thus, the trustee must prove that the value of the debtor's assets immediately after the conveyances in question was less than the debtor's probable liability on debts existing at that time. The issue presented therefore requires a careful valuation of the respective assets and liabilities of the debtor after the conveyances on January 4, 1984.

In calculating the value of the debtor's assets, the debtor's exempt property must be excluded. WIS.STAT. § 242.01(1). The nonexempt assets retained by the debtor consisted of the following:

| | |
|---|---|
| one-half interest in real estate retained by the debtor | $13,600.00 |
| bank accounts at the Boscobel State Bank | 22,288.07 |
| bank account at People's State Bank | 500.00 |
| Wisconsin Power and Light stock | 1,200.00 |
| savings account at Anchor Savings & Loan | 2,652.83 3 |
| TOTAL | 40,240.90 |

In addition to the above items of property, the debtor also held certain other items exempt from execution under state law. Included were four calves which the defendants claim were worth $500.00,[4] an AMC Eagle automobile worth $3,000.00,[5] and a balance of at least $44,000.00 in the State Teacher's Retirement Fund as of January 4, 1984.[6] The debtor's homestead property worth $19,000.00 and her household furnishings and personal possessions worth $1,442.50 were also claimed exempt. None of these items can be considered a part of the debtor's assets on January 4,

gation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

**3.** It is not entirely clear from the bank statements what the balance in the Anchor Savings account was on January 4, 1984, however, by conceding to the highest value possible, $2,652.83, in his proposed findings of fact and conclusions of law, the trustee has in effect stipulated to this figure.

**4.** The debtor claimed three calves exempt for a total value of $300.00. It is unclear what became of the fourth calf but at most its value could total no more than $200.00 in view of the exemption taken.

**5.** The debtor's schedules show a 1981 AMC Eagle claimed as exempt and worth $1,000.00.

**6.** This asset was held to be fully exempt by order of this court on February 3, 1986.

1984, for purposes of the analysis under WIS.STAT. § 242.01(1).

■ The defendants suggest that the debtor had a valuable claim against her son Robert in the amount of $73,000.00. This claim was later filed in Robert's bankruptcy case. However, the trustee in that case returned a no-asset report and the debtor has received no benefit from that claim. Given Robert's extremely precarious financial position it is more likely than not that the debtor's $73,000.00 claim against her son was in fact worthless as of January 4, 1984. It is of no consequence that the debtor may have thought the claim had value on that date, since it is clear that the claim could not have been sold to any prudent purchaser and was thus worthless. *See In Re Lemanski,* 56 B.R. 981, 989 (Bankr.W.D.Wis.1986); *In Re Fulghum Const. Co.,* 7 B.R. 629, 638 (Bankr.M.D. Tenn.1980), *aff'd sub nom., In Re Fulghum Const. Corp.,* 14 B.R. 293 (M.D.Tenn. 1981), *aff'd in part and vacated and remanded in part on other grd's,* 706 F.2d 171 (6th Cir.1983), *cert. denied sub nom., Ranier & Associates v. Waldschmidt,* 464 U.S. 935, 104 S.Ct. 342, 343, 78 L.Ed.2d 310 (1983), *cert denied sub nom., Waldschmidt v. Ranier & Associates,* 464 U.S. 935, 104 S.Ct. 342–343, 78 L.Ed.2d 310 (1983); *In Re Franklin National Bank Securities Litigation,* 2 B.R. 687, 711 (E.D.N.Y.1979), *aff'd sub nom., Corbin v. Franklin National Bank,* 633 F.2d 203 (2d Cir.1980).

Apparently the debtor's only liability as of January 4, 1984, was her joint liability on the Boscobel State Bank's loans to her son Robert. As of January 4, 1984, the debtor's contingent liability to the bank totalled $114,156.92. This amount must be offset by the value of the collateral partially securing the notes. *See Kirkpatrick v. Towers,* 60 Cal.App.2d 251, 140 P.2d 681, 685 (1943); *McCluer v. White,* 338 Mo. 1017, 93 S.W.2d 696, 699–700 (1936). The collateral was appraised by the bank on February 7, 1984, and its value was determined to be $85,050.00. Although the collateral later sold for a somewhat smaller amount, this appraisal, coming close in time

after the date of the transfer, is adequate proof of the value of the collateral on that date. After subtracting the value of the collateral from the amount of the liability it is clear that the debtor was not insolvent on the date of the transfers in question. Her net liability of $29,106.92 was over $11,000.00 less than her non-exempt assets of $40,240.90. The trustee has not met his burden of proof on the question of insolvency and must fail on his section 242.04 claim.

## II.

■ The trustee's second cause of action is based on WIS.STAT. § 242.05 which provides in relevant part:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors ... during the continuance of such ... transaction without regard to his actual intent.

The trustee contends that the "transaction" in which the debtor was engaged, for purposes of this section, was her ongoing liability on her son Robert's notes with the Boscobel State Bank. The trustee must also fail on this claim. While section 242.-05 is not expressly limited by its own terms to persons engaged in business it does appear to be principally directed at those situations in which a party is about to engage in a business venture with an unreasonably small amount of capital relative to the nature of the venture. *See generally Sommermeyer v. Schwartz,* 89 Wis. 66, 61 N.W. 311 (1894); *Kearny Plumbing Supply Co. v. Gland,* N.J.Misc. 789, 151 A. 873 (1930). It cannot be said with assurance that the debtor, a private guarantor, was left with an unreasonably small capital as of January 4, 1984, considering that her assets totalled approximately $11,000.00 more than her net contingent liability on that date. The trustee has failed to meet his burden of proof on the section 242.05 claim.

## III.

The trustee's final cause of action is based on WIS.STAT. § 242.07 which provides in pertinent part:

> Every conveyance made … with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

To sustain this claim the trustee would have to prove actual intent on the part of the debtor to hinder, delay or defraud her creditors. *See Miller v. Lange*, 234 Wis. 460, 290 N.W. 618 (1940). Actual intent may be proven by inferences arising from all the circumstances surrounding the act.

In this proceeding the evidence from which inferences may be drawn is conflicting. It is true that the debtor made substantial voluntary transfers to two of her children, without consideration, near in time to her son Robert's bankruptcy and her attendant liability on the bank's loan. Further, the trustee has entered evidence showing that the bank had attempted to communicate to the debtor concerning her liability on the notes shortly before the transfers took place. The defendants denied that Elizabeth Atkinson received notice from the bank prior to the transfers, or that she had specific knowledge as of January 4, 1984, of the delinquencies related to the promissory notes.

The defendants introduced evidence that the debtor's transfers were motivated by estate planning considerations that were in existence prior to any knowledge on the debtor's part of her extensive liability on her son Robert's debt. Furthermore, the debtor testified that although she did not know the extent of her liabilities on the notes she believed that her exposure for contingent liabilities was minimal. The fact that on January 4, 1984, the collateral securing the notes was worth approximately $85,000.00, lends considerable support to the inference that the debtor did not act with actual intent to hinder, delay, or defraud the bank. The trustee has not met his burden of persuasion on this claim.

## IV.

The trustee has asked in the alternative for the court to order the sale of the acreage owned jointly by the debtor and her son William free and clear of the son's interest. The defendants have stipulated that the sale of an undivided interest in the land would realize significantly less for the estate than the sale of the property free of William Atkinson's interest. Under 11 U.S.C. § 363(h) the trustee may sell both the estate's interest and the interest of the co-owner only if:

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. § 363(h) (1–4). It is undisputed that the property is not used for any of the purposes enumerated in subsection (4). It is also undisputed that sale of the estate's undivided interest alone would realize significantly less than sale of the property free of William Atkinson's interest. According to the appraiser's report the land in question is vacant farmland consisting of two fields, one of forty acres and one of twenty acres. Of the entire sixty acres, forty-four acres are tillable and the balance is forest land. Areas of the land are rocky, rolling, or steep. The appraiser notes that in the current extremely depressed market it would be hard to find a buyer. Given the small and unequal sizes of the two fields, the hilly and rocky nature of some of the ground, and the extremely depressed land market, it is more likely than not that partition of the property between the es-

tate and William Atkinson is impractical. It is also clear that the benefit to the estate of a sale of such property free of William Atkinson's interest outweighs any possible detriment to him. The land in question is vacant farmland and not property upon which William Atkinson is depending for his livelihood. Further, the realization of a significantly higher price if the property is sold free of any undivided interests greatly outweighs any possible detriment to William Atkinson, who will receive one-half of the proceeds of any sale. Sale of the entire sixty acres may be ordered with interest of William Atkinson and all liens to attach to the proceeds.