Michael D. BARRETT and G. Lamar Crittenden, Jr., Plaintiffs, Appellants,

v.

CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY, Defendant, Appellee.

No. 89–1151.

United States Court of Appeals, First Circuit.

Heard June 6, 1989.
Decided Aug. 10, 1989.

Alexander Whiteside with whom Putnam, Bell & Russell, Boston, Mass., was on brief for plaintiffs, appellants.

Richard E. Simpson with whom Garrett B. Johnson, Kirkland & Ellis, Chicago, Ill., Rudolph F. Pierce, Joel R. Leeman and Goulston & Storrs, P.C., Boston, Mass., were on brief for defendant, appellee.

Before BREYER, REINHARDT,* and TORRUELLA, Circuit Judges.

* Of the Ninth Circuit, sitting by designation.

REINHARDT, Circuit Judge:

Appellants Michael Barrett and G. Lamar Crittenden appeal from an order of the district court dismissing their action against Continental Illinois Bank & Trust Co. of Chicago ("Continental"). While the situation which gave rise to Barrett and Crittenden's suit is an intricate one, we can limit our discussion substantially inasmuch as the basis for our decision is relatively uncomplicated. We affirm the district court.

## I.

Barrett and Crittenden were two of the owners of a commodity trading house known as Eastern Capital Corporation ("Eastern"). Eastern appears to have been perennially short of cash and to have had repeated difficulty meeting federally-imposed minimum capital requirements. In December 1982, with the government threatening to shut the trading house down, Eastern turned to a Chicago-based financier, Michael Maduff, who agreed to purchase all of Eastern's stock for $1000 and to infuse the necessary capital into Eastern. In return, Eastern's principals, including Barrett and Crittenden, received an option to repurchase the stock several months later for $51,000 plus the amount of any unrepaid capital contributions made by Maduff.

What happened next is not precisely clear, although it is uncontroverted that, on February 14, 1983, Maduff and Eastern's former owners entered into a new arrangement. Barrett and Crittenden, no doubt still smarting from old wounds, assert in the strongest terms that they made the new deal only because Maduff had taken "a variety of actions designed to make [their original] repurchase option worthless." This may well be true, but it is of little relevance to the instant action. In any event, relations between Maduff and the former owners continued to worsen.

At the same time, the financial health of Eastern began to deteriorate again. Ultimately, a group of disgruntled ex-principals of Eastern, including Barrett and Crittenden, sued Maduff on a variety of federal securities, as well as state contract and fraud, claims. The parties eventually settled this action. In September 1986, Judge Keeton of the District Court of Massachusetts dismissed the suit, via an order which, after a series of extensions, became final in April 1987.

The following month, Barrett and Crittenden went to court again, this time filing the present suit, initially in Massachusetts state court, against Continental. The present action focuses exclusively on a transaction in which Eastern, apparently at Maduff's behest, transferred approximately $2 million to Continental in May 1984. Barrett and Crittenden claim that this transaction left Eastern with an "unreasonably small capital" and was therefore a fraudulent conveyance under section 5 of the Uniform Fraudulent Conveyance Act ("UFCA"), M.G.L. 109A § 5.[1] Specifically, the pair contends that the transfer left Eastern without assets sufficient to cover various claims they held against the corporation.

Continental removed the suit to federal district court under 28 U.S.C. § 1441 and moved for summary judgment. Judge Caffrey at first granted Continental's motion, but, upon a motion for reconsideration, vacated his prior order and allowed Barrett and Crittenden to go to trial on their "unreasonably small capital" theory. *Barrett v. Continental Ill. Nat. Bank & Trust Co.*, 695 F.Supp. 66 (D.Mass.1988). Trial began, without a jury. At the close of the plaintiffs' case, Continental moved for dismissal, alleging that Barrett and Crittenden had failed to prove that Eastern was left with an unreasonably small capital by the challenged transfer. Alternatively, Continental contended that the current suit was barred by res judicata on the theory that the dis-

---

**1.** Section 5 provides:

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

missal of the suit against Maduff, in which Barrett allegedly had attempted to recover the value of certain claims he held against Eastern, barred a later suit on the same claims. Judge Caffrey granted the motion for dismissal on both grounds, ruling:

> First of all, the plaintiff has failed to prove that the company had an unreasonably small amount of capital at a crucial time. Secondly, on res judicata, this has been litigated once. You can't relitigate it.

Barrett and Crittenden appealed.

## II.

We turn first to the district court's conclusion with respect to the fraudulent conveyance question.

### A.

In order to assess Judge Caffrey's finding that Eastern's capital was not unreasonably small at the time of the transfer, we must sketch with greater detail the state of Maduff and Eastern's finances during the spring of 1984. For Maduff, who appears from the record to have been somewhat free-wheeling in his financial affairs, it was not a pleasant spring. His various enterprises were seriously in debt; Continental, one of his major creditors, was demanding payment on outstanding loans. The $2 million at issue in this case existed initially in the form of certificates of deposit issued by Continental. Maduff transferred these certificates to Eastern to cover its capital requirements upon his purchase of the commodities brokerage. The certificates matured in May 1984, and, upon their maturation and Continental's demand for repayment, Maduff transferred the $2 million back to Continental.[2]

Eastern's situation in the months prior to May was similarly grave. The record is uncontroverted that, by May 1984, Eastern was a company winding up its affairs. Negotiations were underway to sell Eastern's only profitable enterprise, a discount brokerage service. A deal to sell this portion of Eastern was consummated on May 17, 1984, one day after the transfer at issue here. Finally, although the record is not completely clear on the point, it does appear that Eastern was insolvent for a short period immediately after the $2 million was transferred. (For reasons that should become clear below, Eastern's solvency on May 16, 1984 does not dispose of the fraudulent conveyance question.) While, as a practical matter, the final May 17 agreement to sell the discount brokerage business held out the promise of new funds sufficient to cover Barrett and Crittenden's claims against Eastern, the proceeds of the sale did not show up on Eastern's balance sheets until the transaction was actually completed, on June 4. Eastern thus appears to have been in violation of federal net capital requirements as of May 31, 1984. Within one business day of discovering the capital shortfall, Maduff and the purchaser of the discount brokerage took several actions which brought Eastern well within the capital requirements. Three days later, the sale of the discount brokerage further enhanced Eastern's financial position, and the record shows that (at least on paper) Eastern's assets, as of June 30, exceeded $1 million.

### B.

■ As a threshold matter, we must decide how to treat Judge Caffrey's conclusion that Barrett and Crittenden failed to prove that Eastern's capital was "unreasonably small." Continental urges that,

---

**2.** In describing this transaction, the parties go into minute detail about the corporate structure of the various Maduff corporations, although Eastern's place in the Maduff corporate family is essentially irrelevant to the fraudulent conveyance question. In a nutshell, Eastern, upon its acquisition by Maduff, became a wholly-owned subsidiary of one of Maduff's companies. When Maduff transferred to Eastern the $2 million which he had received from Continental, he did it by "downstreaming" the funds (i.e. transferring them from the parent, down through the corporate family, until they arrived at Eastern). In May 1984, with Continental insisting that the "new" $2 million had to be "traceable" to the "original" $2 million, the money was then "upstreamed" through the same entities, and the funds returned to Continental via a series of bona fide (or at least unchallenged) corporate resolutions.

**4**

inasmuch as the proceeding below was a bench trial with the judge filling the fact-finder's role, we should consider the conclusion to be basically a factual finding, subject to review only for clear error. We agree. The judgment about whether Eastern's capital was unreasonably small after the $2 million dollar transfer is a factually-grounded one; accordingly, we shall not set it aside unless clearly erroneous. *See F.P.P. Enterprises v. United States*, 830 F.2d 114, 117 (8th Cir.1987) (district court's conclusions with respect to fraudulent characteristics of challenged transfers subject to clearly erroneous review). *See also Keyes v. Secretary of the Navy*, 853 F.2d 1016, 1019 (1st Cir.1988).

■ Barrett and Crittenden's position is essentially that the district court must have clearly erred, for, they claim, Eastern's apparent insolvency on May 16, 1984—the precise date of the transaction at issue—conclusively establishes that the transfer left Eastern with an unreasonably small capital within the terms of § 5 of the UFCA. We do not believe the matter to be so simple, nor is the result Barrett and Crittenden seek compelled by the cases they cite. The case upon which the pair relies most heavily is *United States v. Gleneagles Inv. Co., Inc.*, 565 F.Supp. 556 (M.D.Pa.1983), *aff'd sub nom., United States v. Tabor Realty Corp.*, 803 F.2d 1288 (3d Cir.1986).[3] Barrett and Crittenden correctly note that, at several places in its opinion, the *Gleneagles* court stated that its § 5 analysis would deal with the capital condition of the corporation as of the specific date of the allegedly fraudulent conveyance, in that case November 26, 1973. *See Gleneagles*, 565 F.Supp. at 573, 578. At the same time, when it actually performed its "unreasonably small capital" analysis, the court looked to a decidedly more expansive period of time, ultimately determining that "[b]oth before the November 26, 1973 transaction as well as thereafter, the transferor did not have the capital resources it needed to carry on its business." *Id.* at 580. It thus appears

that in *Gleneagles*, although it seemed to focus on the specific date of the transaction, the court actually took into account the corporation's capital levels during a period extending in both directions from that date. We believe that the proper application of § 5 requires a court to examine a company's capital throughout a reasonable period of time surrounding the precise date of a challenged transfer. This approach avoids the risk of ascribing undue weight to the state of a company's balance sheet on a particular day, and allows the court to make a realistic assessment of the impact of a transfer on a company's ability to conduct its affairs.

■ In addition, the *Gleneagles* court took into account what "resources [the corporation] needed to carry on its business" when it examined whether the corporation's capital was unreasonably small. "Unreasonably" is clearly a relative term and demands, for purposes of § 5, the sort of relative, contextual judgment which looks to both the ends served by § 5 and the overall state of affairs surrounding the transferor corporation and the challenged transfer itself. The critical inquiry when considering whether a transfer or conveyance has left a company with an unreasonably small capital is, therefore, one that weighs raw financial data against both the nature of the enterprise itself and the extent of the enterprise's need for capital during the period in question. *See Matter of Atkinson*, 63 B.R. 266, 269 (Bankr.W.D. Wisc.1986) (for violation of § 5, capital must be unreasonably small "relative to the nature of the venture").

This approach appears to be essentially the one followed in Massachusetts. In *Widett v. George*, 336 Mass. 746, 148 N.E.2d 172 (1958), the Massachusetts Supreme Judicial Court held that questions concerning the adequacy of capital after a challenged transfer had to be "judged prospectively" from the date of the transfer. 336 Mass. at 751, 148 N.E.2d 172. Under the *Widett* approach, a court begins its analysis with the transfer and then exam-

---

3. The Third Circuit did not address the *Gleneagles* court's treatment of the UFCA § 5 issue.

Consequently, we discuss the case solely in reference to the district court opinion.

ines the relationship, if any, between the amount of capital remaining in the business in the period after the transfer and the business' ability to continue operations during that period in the same manner as it conducted them before the transfer. In our view, this is the most sensible construction of § 5.

In this instance, we address a somewhat unusual case, for the challenged transfer was made by a company that was indisputably going out of business at the time the transfer was made. We note that some courts have observed that the basic purpose of § 5 is to "prevent an undercapitalized company from being thrust into the market place to attract unwary creditors to inevitable loss," *Wells Fargo Bank v. Desert View Building Supplies*, 475 F.Supp. 693, 696 (D.Nev.1978), *aff'd*, 633 F.2d 225 (9th Cir.1980), and have accordingly concluded that the section's application is "limited to businesses that are continuing on some scale." *See, e.g., In re Pinto*, 89 B.R. 486, 501 (Bankr.E.D.Pa.1988). While we agree with the *Wells Fargo* court's characterization of the most significant end served by § 5, we decline to adopt a per se rule which would preclude the application of the section to any transfer made by a company winding up its affairs. There may well be situations, of which we need not speculate here, in which § 5 would present a worthy creditor's only redress for a palpably fraudulent transfer. At the same time, however, the fact that a company is in the process of going out of business is ordinarily the critical element in a court's contextual assessment of the "reasonability" of the company's capital for the post-transfer period.

Thus, when we examine the $2 million transferred from Eastern in May 1984, it is apparent that Judge Caffrey did not clearly err in concluding that Barrett and Crittenden failed to prove a violation of § 5. Eastern was an entity winding up its affairs; indeed, it entered into an agreement to sell its only profitable business within a day of the transfer. There were no "unwary [prospective] creditors" who were about to invest in Eastern, only to suffer "inevitable loss." *See Wells Fargo*, 475 F.Supp. at 696. In short, when the transfer is placed in the broader context of the operations Eastern contemplated during the spring of 1984, the $2 million payment to Continental does not appear to us to have left the company with an "unreasonably small capital."

Eastern did, of course, have its creditors, Barrett and Crittenden among them. And Eastern may have been technically insolvent, possibly for as long as two weeks, after it paid back Continental's $2 million. Nevertheless, Judge Caffrey's conclusion that Barrett and Crittenden failed to show that Eastern's capital was unreasonably small at "a crucial time" is one amply supported by the record, and one we will not overturn as clear error here. Eastern was unquestionably solvent by June 1, 1984, and had sufficient assets to cover all of Barrett and Crittenden's potential claims against it by that time. Indeed, upon learning at trial just how substantial Eastern's assets were as of June 30, 1984, Crittenden reflected that he "regret[ted] that [he] didn't move for an attachment [then]."

With admissions such as this from one of the plaintiffs, and based on the full record as it existed at the close of the plaintiff's case, we will not disturb the conclusion of the district court that Barrett and Crittenden failed to prove a violation of § 5 of the Uniform Fraudulent Conveyance Act. Accordingly, the judgment of the district court is

AFFIRMED.[4]

---

4. In light of our conclusion that the district court's judgment can be sustained on the first ground asserted by Continental in its motion to dismiss, we express no view on the question whether the court below correctly held that Barrett and Crittenden's suit against Continental was barred by doctrines of res judicata.